JOSEPH L. MACOMBER & wife *vs.* JOHN D. GODFREY.

In an action for diverting a brook from the plaintiff's land, it appeared that, at a point on the defendant's land, below the place of the alleged diversion, the water ceased to flow between defined banks, spread itself out several rods wide, and ran so, over the surface of the ground, for five rods, to the plaintiff's land, across which it spread and ran for seven rods in like manner, and then began to flow again in a defined channel, which conducted it into a river. *Held,* that the brook did not cease to be a natural watercourse on the plaintiff's land, and that he could maintain the action.

A brickmaker, who owned and occupied a tract of land for his business, was accustomed to vary the course of a brook across it, from time to time, to suit the convenience of the business, but never varied it so as to prevent its traversing the whole tract. Upon his death, his two heirs, who knew of this custom, divided the tract between themselves by mutual deeds of quitclaim, after which the heir who took the upper portion of it diverted the brook from flowing through the lower portion. *Held,* that the first named heir took no easement in the land quitclaimed to the other heir, and that the latter could maintain an action against him for diverting the course of the brook.

TORT for the diversion of a watercourse by the defendant, whereby the water was prevented from flowing through the plaintiffs' land and irrigating their crops. Trial in the superior court, before *Scudder,* J., who made the following report thereof:

"The plaintiffs' counsel, in his opening to the jury, stated that the evidence would show that from time immemorial a natural stream of water had flowed from a southerly direction across the road and upon the defendant's land, taking a northwesterly course across the defendant's land; that for a part of the way across the same it ran in a well defined channel, but when it reached a point within about five rods of the plaintiffs' adjoining land the water spread out over the surface of the ground, covering a space a few rods in width, and so ran upon and across the plaintiffs' land, which was a level meadow, covering the same for several rods in width, and irrigating it in a valuable manner through its whole length, about seven rods, and thence on to other land of other owners beyond; that from the point where it so spread out over the surface on the defendant's land there was no defined channel either on the defendant's land or through the whole length of the plaintiffs' land, and not until a short distance beyond the plaintiffs' land, where it again formed a small brook, and ran off in a westerly direction to the river; that the plaintiffs' and defend-

ant's lands formerly belonged to the same ancestor, and the division was made after his death by quitclaim deeds; and that the defendant diverted this stream on his own land near to the road, where it was a watercourse running in a defined channel, turning it in a northerly direction so that it ceased to flow upon the plaintiffs' land, thus injuring their land and crops.

" Upon this opening statement, the judge ruled that the plaintiffs' action could not be maintained, and with the consent of parties reports the case before verdict for consideration by the supreme judicial court. If the above ruling is correct, judgment is to be entered for the defendant; if it is incorrect, the case to be sent back for trial."

*E. H. Bennett,* for the plaintiffs.

*C. I. Reed & J. H. Dean,* for the defendant.

CHAPMAN, C. J. The defendant admits the well established principle, that, where there is a natural watercourse, each successive riparian proprietor has a right of property in it, and may maintain an action against one who diverts it from coming down to his land. But he contends that the facts stated in the report are not sufficient to establish the existence of such a watercourse. This is the only point now presented to us.

We cannot doubt that water, which has flowed from time immemorial in a well defined channel till it comes upon the defendant's land, and again after it has passed a short distance beyond the plaintiffs' land forms a brook, and thus runs across the land of several proprietors to a river, into which it empties, is a natural watercourse when it thus flows. But the defendant contends that because, at a point on his land about five rods above the plaintiffs' land, the water spreads out over the surface, covering a space of a few rods in width, and thus runs upon and across the plaintiffs' land, which is a level meadow, and covers the same for several rods in width, irrigating it in a valuable manner through its whole length, being about seven rods, and during this whole length of twelve rods has no defined channel, it ceases to be a watercourse, and is to be regarded as mere surface water, to the flow of which the plaintiffs have no right.

If the whole of the stream had sunk into the defendant's soil, and no water remained to pass to the plaintiffs' land except under the surface, it would have ceased to be a watercourse, and the plaintiffs would have had no right to it. *Broadbent* v. *Ramsbotham*, 11 Exch. 602. *Buffum* v. *Harris*, 5 R. I. 243. Or if the water had only flowed in temporary outbursts, caused by melting snow or by rain, it would have been surface water, as in *Ashley* v. *Wolcott*, 11 Cush. 192 ; the defendant might have diverted it; and the plaintiffs might have raised barriers on their land to prevent its flowing upon their lot below. *Gannon* v. *Hardagon*, 10 Allen, 106. *Franklin* v. *Fisk*, 13 Allen, 211. But where, owing to the level character of the land, it spreads out over a wide space without any apparent banks, yet usually flows in a continuous current, and passes over the surface to the lands below, it still continues to be a watercourse. *Gillett* v. *Johnson*, 30 Conn. 180. If the plaintiffs had erected a barrier to keep it from their land, it would evidently have accumulated, by its natural and regular flow, upon the defendant's land, not merely when there were melting snows or rains, but at all ordinary seasons. We cannot doubt that not only the defendant, but all the lower proprietors, could have maintained an action against the plaintiffs for any damage caused by such obstruction. For it has a regular and natural flow from a permanent source ; and its usual course is in a channel, with a well defined bed and banks, and neither upon the land of the plaintiffs or of the defendant does it entirely lose this character.          *Case to stand for trial.*

At the new trial, before *Dewey*, J., the jury returned a verdict for the plaintiffs, and the judge allowed the following bill of exceptions :

" One ground of the defence was, that there never was any watercourse flowing over the plaintiffs' land, and that, if there was, the same had been diverted therefrom prior to 1851, when the plaintiffs' title accrued. It appeared that the lands, both of the plaintiffs and the defendant, which adjoined each other, descended from John Godfrey, the common ancestor of the female plaintiff and the defendant ; and that a division of the property

was made among his heirs by mutual quitclaim deeds in common form, in 1851 ; that the premises had been used by said ancestor and those holding under him, as far back as the memory of the witnesses extended, for the purpose of making brick, and were so used at the time of his death ; and that the effect of carrying on this business was to materially change the level of the land worked over. The evidence tended to show that the brook in question had been changed in its course prior to the year 1851, while running over what is now the defendant's land, from time to time, to answer the necessities of the business of making brick, without reference to the direction the water afterwards took in consequence of these changes ; but that the water always ran through the land now of the plaintiffs, and that the change complained of was made by the defendant in 1868, to suit the exigencies of his brickmaking operations, tending, as the plaintiffs contended, to turn the water off more northerly than ever before, whereby it ceased to flow on the plaintiffs' land.

" The defendant requested the judge to instruct the jury, that if they should find that the tract of land had always, so far back as the testimony goes, before the division between the heirs of John Godfrey, been used by him for making brick, and that the water running on to it had always been turned as suited the exigencies of the brick manufacture, and that at the time of the division this was known to the heirs, then the present owner and the other heirs took under the division their several shares subject to the right of the heir to whom the special tract, so used, had been assigned, to turn the water as the exigencies of the brick business required.

" The judge refused to give this instruction, but instructed the jury that the plaintiffs must prove that there was in the year 1851, at the time of the conveyance to the plaintiffs, a natural watercourse running from the land at the same time conveyed to the defendant, over and through the land at the same time conveyed to the plaintiffs ; and if so, that the plaintiffs became entitled to its enjoyment and continued flow through their land, and if the defendant thereafter diverted the stream on his own land, turning it in another direction so that it ceased to flow over and

upon the land of the plaintiffs, thereby diminishing the value of their land and crops for want of the usual irrigation, the defendant would be liable.

" The judge gave instructions to the jury as to what was necessary to constitute a natural watercourse, to which no objection was made ; but to the refusal to instruct as above requested the defendant excepts." This case was argued at October term 1872.

*Reed & Dean*, for the defendant.

*W. H. Fox*, for the plaintiffs.

CHAPMAN, C. J. The defendant's request for instructions was based on the idea that John Godfrey, the ancestor of the parties, might during his lifetime, by a particular use of the stream, create an easement upon his own land. But his ownership of the fee merged all inferior rights, and one part of his land could gain no rights adverse to any other part. Upon his death, the property descended to his heirs in fee and in common.

When the heirs made partition of the land by quitclaim deeds, if one of them desired to acquire any right to divert the stream from its natural channel, in which it then flowed, it would be necessary to have the right expressed in the deeds ; otherwise, the party who took the lot upon which the channel of the stream was situated would take the stream as well as the soil. The use which the ancestor had been accustomed to make of the water would give the defendant no easement in the plaintiffs' lot. The defendant took no grant of such easement, and made no reservation of it, and therefore obtained no right to the water. However useful or necessary the water might be to his business of brickmaking, neither utility nor necessity would authorize him to take what belonged to the plaintiffs. The ruling and the refusal to rule were in conformity with the legal rights of the parties under their quitclaim deeds. *Exceptions overruled.*