O'Connell v. The East Tenn., Va. & Ga. Railway Co.

When a railway company erects an embankment for its track along the margin of a river, the accumulated waters of which, in times of flood, had previously escaped on that side, it being lower than the other, but which, thereafter and because of the embankment, overflowed the opposite side more than it had done before, and thus injured land there situate, the owner has a right of action against the company; or, if by the erection of such embankment the river was deflected from its natural course, or deposits were made therein so as to raise its bottom, and from either of these causes such land was injured by the river, when swollen, a recovery may be had for the damages thereby occasioned.

May 27, 1891.   Argued at the last term.

Water and watercourses. Damages. Before Judge Miller. Bibb superior court. April term, 1890.

Reported in the decision.

Gustin, Guerry & Hall, for plaintiff.

Bacon & Rutherford, for defendant.

Lumpkin, Justice.

The precise question in this case is whether the owner of land on the bank of a river can without liability erect on his own land an embankment which increases the overflow in times of flood upon the lands of the opposite proprietor to the injury thereof; or is

there any duty for each owner to receive upon his land the share allotted it by nature of the flood waters of the river. It is contended by defendant's counsel that the overflow from a river in time of flood or freshet is surface water, against which, by the common law, a man may protect himself without regard to the consequences to his neighbor. Many cases cited by him make a distinction between the common law and the civil law as to surface water, the former allowing the land-owner to dispose of it in any way, the latter restraining him from so using it as to injure his neighbor's tenement. There is authority to show that there is no difference between the common and the civil law in this respect, but that the common follows the civil law. Gilham v. Mad. Co. R. R. Co., 49 Ill. 484; Gormley v. Sanford, 52 Ill. 158; and the able opinion in Boyd v. Conklin, 54 Mich. 583, 52 Am. Rep. 831. There is much conflict in the American cases (Washburn, Easements, p. 485, *353 et seq.), the majority of the States seeming to follow the so-called civil law rule. Thus it is material to consider whether the overflow as above stated is properly classed with surface water. This depends upon the configuration of the country and the relative position of the water after it has gone beyond the usual channel. If the flood water becomes severed from the main current, or leaves the stream never to return, and spreads out over the lower ground, it has become surface water. But if it forms a continuous body with the water flowing in the ordinary channel, or if it departs from such channel animo revertendi, presently to return, as by the recession of the waters, it is to be regarded as still a part of the river. The identity of a river does not depend upon the volume of water which may happen to flow down its course at any particular season. The authorities hold that a stream may be wholly dry at times without losing the character of a watercourse.

So, on the other hand, it may have a "flood-channel" to retain the surplus waters until they can be discharged by the natural flow. The low places on a river act as natural safety-valves in times of freshet, and the defendant claims the right to stop up one of these without liability for ensuing damage.

The English cases on the question are not numerous, though from the decisions and *dicta* of the judges, the law appears to be well understood and settled. In Rex v. The Pagham Commissioners, 8 B. & C. 355, it was held that an owner of land on the sea-shore could erect works to protect his land from encroachments by the sea, without liability for damage inflicted on his neighbor. The sea was called a " common enemy" against which each might fortify at will. It appeared in Rex v. Trafford, 1 B. & Ad. 874, that a canal had been built by authority of parliament, and carried across a river and the adjoining valley by means of an aqueduct and an embankment containing several arches. A brook fell into the river above its point of intersection with the canal. In times of flood the water, which was then penned back into the brook, overflowed its banks, and was carried, by the natural level of the country, through the arches into the river, doing much mischief to the lands over which it passed. The aqueduct was sufficiently wide for the passage of the river at all times but those of high flood. The occupiers of the injured lands adjoining the river and brook, for the protection thereof, erected banks (called "fenders") so as to prevent the flood water from escaping; consequently the water, in time of flood, came down in so large a body against the aqueduct and canal as to endanger them and obstruct the navigation. The fenders were not unnecessarily high, and without them many hundred acres of land would be exposed to inundation. It was held that the defendants were not justified, under these circum-

stances, in altering for their own benefit the course in which the flood water had been accustomed to run; that there was no difference in this respect between flood water and an ordinary stream; that an action would have lain at the suit of an individual, and consequently that an indictment lay where the act affected the public. The conviction was accordingly sustained. The doctrine of Rex v. Pagham, *supra*, was sought to be extended to this case, but Tenterden, C. J., who had rendered the decision in that case, said: "It has long been established that the ordinary course of water cannot be lawfully changed or obstructed for the benefit of one class of persons, to the injury of another. Unless, therefore, a sound distinction can be made between the ordinary course of water flowing in a bounded channel at all usual seasons, and the extraordinary course which its superabundant quantity has been accustomed to take at particular seasons, the creation and continuance of these fenders cannot be justified. No case was cited, or has been found, that will support such a distinction. The Pagham case . . is of a very different kind. . . In the one case, the water is prevented from coming where, within time of memory at least, it never had come; in the other, it is prevented from passing in the way in which, when the occasion happened, it had been always accustomed to pass." This seems to be an authoritative enunciation of the common law. Menzies v. Breadalbane, 3 Bligh, 414, is directly in point, but was determined by the law of Scotland. Yet the Lord Chancellor said: "It is clear, beyond the possibility of a doubt, that by the law of England, such an operation could not be carried on. The old course of the flood stream being along certain lands, it is not competent for the proprietors of those lands to obstruct that old course, by a sort of new water-way, to the prejudice of the proprietor on the other side." In Attorney

Gen. *v.* Earl of Lonsdale, L. R. 7 Eq. 387, 20 Law Times, 64, it was attempted to extend the sea doctrine to the case of a tidal river, but Vice-Chancellor Malins refused to so extend it on the authority of Menzies *v.* Breadalbane, *supra,* saying that Lord Eldon put that case upon the general law of England. In Mason *v.* Shrewsbury, etc. R. Co., L. R. 6 Q. B. 581, we find a *dictum* by Blackburn, J., as follows: "Before the canal was made, the person whose estate the plaintiff now has had the ordinary rights and liabilities of a riparian owner on the banks of a natural stream. He was entitled to have the water flow to him in its natural state, so far as that was a benefit, as for instance, to turn his mill or water his cattle; and he was bound to submit to receive the water, so far as it was a nuisance, as by its tendency to flood his lands." Lawrence *v.* Great Northern R. Co., 4 Eng. Law & Eq. 265, 16 C. B. 643, is considerably in point. A railway was constructed across certain lowlands adjoining a river, over which the flood waters used to spread themselves. These lowlands were separated from the plaintiff's lands by a bank, constructed under certain drainage acts, which protected the plaintiff's lands from floods. By the construction of the railway the flood waters could not spread themselves as formerly, but were penned up and flowed over the bank upon the plaintiff's lands It was held that an action would lie against the company for the injury. Patterson, J., said: "*Prima facie* this would give the plaintiff a cause of action, and the question is whether the company are protected by their act," a question which cannot arise in our law.

In connection with the cases of Rex *v.* Trafford and Lawrence *v.* Railway, *supra,* it must be borne in mind that the first obstruction of the flood waters there mentioned is, in England, justified by the statute authorizing it, and therefore stands on much the same footing

as a natural obstruction; but the liability of the other party, who erected the second obstruction without statute authority, springs from the common law. No English authority has been found to controvert these principles; but the text-writers recognize them as settled law. Woolrych on Waters, 213 (78 Law Lib. 212); Crabb on Real Prop. §420 (54 Law Lib. 263); Michael & Will on Gas & Water, pp. 213, 214, 666 (London ed. 1884); Angell on Watercourses, §§333, 334; Gould on Waters, §§160, 209.

In grouping the American cases, those tending to sustain the contention of defendant in error will first be stated. Taylor v. Fickas, 64 Ind. 117, 31 Am. Rep. 114, was much relied upon. There the injury was caused by the obstruction of the passage of drift-wood, both owners being on the same side of the river and the lower owner having planted a row of trees along the dividing line. The opinion, it is true, treats overflow in flood times as surface water; but it will be noticed that nothing is said or decided about changing the course of the water. The facts are obviously different from those in the present case. In Cairo, etc. R. R. Co. v. Stevens, 73 Ind. 278, 38 Am. Rep. 139, the plaintiff's land was between the river and the railroad embankment. The overflow is treated as surface water, and the road held not liable. But it would seem that the water doing the damage had left the river never to return. Shelbyville Turnpike Co. v. Green, 99 Ind. 205, follows the last case. The turnpike was flooded because of an embankment erected by Green to protect his land from overflow, both parties being on the same side. It was held that the company could not recover. But note that the court adverts to the fact that the company did not own the soil over which the pike ran, but merely had an easement therein. McCormick v. Kansas, etc. R. R. Co., 57 Mo. 433, can also be distin-

guished. Here the overflowing water left the stream permanently and entered a pond formed thereby and by other surface water, the draining of which pond caused the injury sued for. In Shane v. Kansas, etc. R. R. Co., 71 Mo. 237, 36 Am. Rep. 480, the overflow is apparently treated as surface water, although it had a way, through a slough, back into the stream. But the court applied the civil law and held the railroad liable. This case, together with that of McCormack (70 Mo. 359), is overruled in so far as the civil law was followed, by Abbott v. Kans. etc. R. R. Co., 20 Am. & Eng. R. R. Ca. 103, and the common law as to surface water returned to. In this last case it is said that the court in the Shane case treated the overflow as part of the stream, and therefore that the decision was correct on common law principles. In the Abbott case the court expressly assumes the waters to be surface waters; it seems they escaped from the bed of the creek and flowed over the lands without any return.

Lamb v. Reclamation Dist., 14 Pac. Rep. 625 (Cal.), is not much in point. The defendant was a public corporation for the purpose of reclaiming the lowlands protected by the embankment which closed up a slough through which an inconsiderable part of the flood waters escaped into a natural basin. The plaintiff's land lay two miles below on the opposite side. The court applied the sea doctrine of the common law, and held the company not liable. But the decision is mainly rested on another ground, namely, that the corporation was not liable as for exercising the right of eminent domain. And in view also of the concurring opinions, the case is weak on the question involved in the case at bar. See below for an earlier decision by the same court looking another way, not noticed in the case above. In Hoard v. DesMoines, 62 Iowa, 326, 17 N. W. Rep. 527, the plaintiff's land was between the river and

the embankment, and it was held that the plaintiff had no right to have the flood waters from the river pass over his land onto that of another, although they finally joined the river again at a point farther down.

At first view, Moyer v. N. Y. Central R. R. Co., 88 N. Y. 351, seems to support the defendant's position. But a close examination shows otherwise. The complaint averred that the damage was caused by the railroad *building an embankment* on the opposite side of the river. Evidence was offered and objected to, to show damage caused by *raising the tracks;* it was admitted, the railroad excepting. The referee included in his finding for the plaintiff the damages caused by raising the tracks, as to which the complaint alleged nothing, thus tainting the whole finding with illegality. The judgment was reversed for the error in admitting said evidence, and in said finding. The court say, the defendant, as a matter of law, would not be liable for consequential damages caused by the raising of the embankment on the company's own land in a proper and workmanlike manner, citing Bellinger v. N. Y. C. R. R., 23 N. Y. 47. This case bases the freedom from liability upon the legislative authority, but concedes that a private individual would be liable under the same conditions. In our law the railroad occupies no better position in this respect than the private individual.

Now will be stated the American cases going to show that the defendant is liable, if it has erected the obstruction to the flood waters of the river as complained of in this case. The surplus waters do not cease to be part of the river when they spread over the adjacent lowgrounds, without well-defined banks or channel, so long as they form with it one body of water eventually to be discharged through the channel proper. Thus it is held, where the waters of a stream disperse themselves over low ground, without any well-marked course, but

gather up lower down into a defined channel, they are not surface water while in the dispersed state, and interference with them then gives the injured party a right of action.    Macomber v. Godfrey, 108 Mass. 219 ; Gillett v. Johnson, 30 Conn. 180; Briscoe v. Drought, 11 Ir. C. L. 250 ; West v. Taylor, 16 Or. 165.    But if it were conceded that the overflow is surface water, it would certainly cease to be such when turned back into the stream by the defendant's obstruction.    Sullens v. Chic. etc. R. Co., 74 Iowa, 659, 7 Am. St. Rep. 501 ; Moore v. Same, 75 Iowa, 263; Jones v. Hannovan, 55 Mo. 462; Miss., etc. R. Co. 41 Am. & Eng. R. R. Ca. 4, 7 So. Rep. 212.    Under these authorities, this declaration might be sustained as complaining that the defendant prevented the flood-waters from becoming surface waters and threw them back across the river upon plaintiff's land.    (See further, as to surface water 17 Central L. J. 42, 62; Angell on Waterc. §108a et seq.; Gould on Waters, §263 et seq.)    But it is not necessary to take this view, as the following authorities show the defendant to be liable under the alleged facts :

Where the effect of the defendant's dike was to retain on the land of the plaintiff flood waters from the river longer than they would otherwise remain, the injury was held actionable, and the demurrer overruled. Montgomery v. Locke (Cal.), 11 Pac. Rep. 874.    Where in a freshet the stream broke over one of its banks, carrying a part of it away, it was held that the owner might replace the bank with a dam, provided he did not build higher than the original bank, or otherwise cause the water to flow differently from the natural flow. Pierce v. Kinney, 59 Barb. 56.    "It is well settled that every person through whose land a stream of water flows, may construct embankments and other guards on the bank to prevent the stream washing the bank away and overflowing and injuring his land.    But in

doing this, he must be careful so to construct them as not to throw the water upon his neighbor's lands where it would not otherwise go in ordinary floods. If he does, he will be liable for the injury." Wallace *v.* Drew, 59 Barb. 413. There is no distinction in principle or authority between obstructing the flow of a stream at its ordinary level and in time of flood. Burwell *v.* Hobson, 12 Grat. 322, 65 Am. Dec. 247. This case is in point and holds the defendant liable. Another case in point is Crawford *v.* Rambo, 44 Ohio St. 279, 7 N. E. Rep. 729, holding that flood water is not surface water and that interference therewith gives a right of action. So Byrne *v.* Minn. etc. R. Co. (Minn.), 36 N. W. Rep. 339, 8 Am. St. Rep. 668, holds that overflow in times of high water is not surface water, and the railroad is liable for obstruction of such water by an embankment erected on its own land. (See also Rau *v.* Minn. Val. R. R. Co., 13 Minn. 442, where the railroad made an extensive excavation on its own land, into which overflow waters from the Mississippi river entered to the damage of an adjoining owner. The railroad was liable.) Gerrish *v.* Clough, 48 N. H. 9, 97 Am. Dec. 561 and notes, and Tuthill *v.* Scott, 43 Vt. 525, 5 Am. Rep. 301, seem not to involve the question as to the action of the water in times of flood, but are adverse to defendant as far as they go. In Carriger *v.* East Tenn. etc. R. R. Co., 7 Lea (Tenn.), 388, the railroad embankment did not affect the usual flow of the streams, but obstructed the flood channel and threw the excessive waters upon the plaintiff's lands. This same defendant contended that they were surface waters which it had a right to obstruct. The trial court gave judgment for the defendant, holding "that the overflow in question resulted from accumulations of surface water caused by extraordinary rains, and that the law relating to surface water, and not that of running streams, gov-

erns the case." The Supreme Court said : "The question to be determined is, is this such surface water as to relieve the defendant? . . The springs and their branches are never failing, and flow off in a northward direction toward the farm of plaintiff. In ordinary times they find outlets through the caverns or sinks in the earth; in extraordinary times their volumes are too great for the usual place of discharge. These springs and branches are sometimes large and sometimes small; still they are the same springs and branches, requiring, as all running streams do, sometimes less and at other times more surface for their escape. . . If the embankment had been erected in a valley near a low bank of the river, which overflowed at high tide but escaped in one passage so as not to materially injure adjoining lands, but if obstructed by the embankment would overflow and damage, as in this case, we think it would not be insisted that it was not obligatory on the defendant to build a culvert to prevent damage that must certainly come with the high tide. Is there a difference in reason as to the case put and the one at bar ? We think not. While they may not be so frequent, the overflows from the branches are as certain as those from the river ; one is as certainly a constant running stream as the other. . . It is no defence for it to say that it was only in extraordinary times the injuries now complained of could result. The rises in the waters had for all time occurred at intervals before the building of the road, and it was to be conclusively presumed they would occur afterwards from similar causes." The court entered judgment for the plaintiff. This is a stronger case than the one now to be decided. Counsel for defendant ably and strenuously insist that the common, and not the civil law be applied to this case. The above authorities prove that the common law does not regard the waters here complained of as mere surface

water, but as a part of the river. The civil law might be more favorable to the defendant's case; for it seems to regard the flood waters of a river as a common enemy against which each riparian owner may build defences with impunity. Mailhot *v.* Pugh, 30 La. An. 1359, citing authorities.

The defendant also claims that the question is settled by an act of the legislature, and cites section 2232 of the code. That section says: "All persons owning, or who may hereafter own, lands on any watercourses in this State, are authorized and empowered to ditch and embank their lands, so as to protect the same from freshets and overflows in said watercourses : *Provided always*, that the said ditching and embanking does not divert said watercourse from its ordinary channel, but nothing shall be so construed as to prevent the owners of land from diverting unnavigable watercourses through their own lands." This contention may be answered in three ways: First, the declaration in this case distinctly alleges that the defendant did divert the river from its ordinary channel, for which act the statute affords no shadow of protection. Secondly, the allegations of the declaration do not show that defendant embanked its land "so as to protect the same," but constructed an embankment on which to lay its track without regard to any consequences of benefit or injury to the contiguous country. Thirdly, the construction long ago and repeatedly put by this court on the last part of the section, which says "nothing shall be so construed as to prevent the owners of land from diverting unnavigable watercourses through their own lands," necessitates the conclusion that this whole statute is not alterative but only declaratory of the common law. In other words, the legislature did not intend to give riparian owners the privilege of ditching or embanking their lands, or of diverting unnavigable water-

v 87-17

courses, so as to injure neighboring proprietors without liability therefor.    Indeed, the power of the legislature so to alter the common law is. expressly denied in *Persons* v. *Hill*, 33 *Ga. (Supplement)*, 143.  And in *Cheeves* v. *Danielly*, 80 *Ga.* 118, the same view is taken as to the intention of the legislature in passing this act.    It is true, these cases deal with the diversion of an unnavigable stream, but it would be absurd to impute to the legislature two conflicting intentions in the same act. And the ground taken in *Persons* v. *Hill* will equally well support the same rule of construction as to the other branch of the statute.    The facts in *Persons* v. *Hill* require notice.    The owners were on the same side of the Flint river, into which Beaver creek emptied after passing through the defendant's land.    By mutual agreement between the upper owner (plaintiff) and the lower owner (defendant), the expense being also shared, an embankment was erected along the river to keep back the flood waters which, from the facts of the case, seemed to have this course, that is to say: coming out on plaintiff's land, they flowed across the same and over defendant's land into the creek by which they would empty back into the river.    The embankment not being kept up according to the agreement, defendant proposed to protect himself by diverting the creek through a canal on his own land to the river and building an embankment along his side of the canal.    This canal would make an opening through the high bank of the river, and, with the embankment, would allow and cause the high waters to back up on plaintiff's land.    This court granted an injunction against the construction of the canal, but allowed the defendant to continue the embankment.    One great difference from the present case might be found in the agreement for consideration· to have the common protection of the first embankment.    See *Savannah, etc. Ry.* v. *Lawton,*

75 *Ga.* 192.    But at any rate, the decision does not contemplate that defendant's individual embankment would injure the plaintiff's land, such an inference being inconsistent with the plain language of the opinion on p. 147.

There is another section of the code, not cited or discussed in the argument, which deserves mention in this connection :    " No person shall be permitted to make or keep up any dam to stop the natural course of any water, so as to overflow the lands of any other person, without his consent, nor shall any person stop or prevent any water from running off of any person's field, whereby such person may be prevented from planting in season or receive any other injury thereby, nor so as to turn the natural course of any water from one channel or swamp to another, to the prejudice of any person."    Code, §1607. This statute was passed September 29th, 1773, and apparently revived by the act of February 25th, 1784 (Marbury & Crawf. Dig. p. 404), being recognized by subsequent amendments and by the codes.    Acts 1855–6, p. 12 ;    Acts 1865–6, p. 27.    It is put in the code under the head " Cultivation of Rice," but from reading the original act (Marb. & Crawf. p. 178), it is by no means clear that it was intended to apply only on rice farms.    Neither the title nor the body of the act contains the slightest intimation to that effect.    Its terms are as broad and general as they well could be.    The preamble, it is true, in stating the mischiefs to be remedied, describes such as probably were common in the localities where rice was cultivated, though even here there is no distinct allusion to rice culture.    These mischiefs may, as a matter of history, have occasioned the enactment of the statute.    But might not the legislature have deemed it wise to pass a general law, applicable in all portions of the State where similar mischiefs were likely to happen ?    It is not inconsistent with the

purpose of an act for curing a special class of mischiefs to provide therein a remedy at the same time for all mischiefs of that genus. On the contrary, that would be a highly proper mode of legislation. If the preamble is not to be given a controlling and restrictive effect, this act alone would completely and effectually dispose of the present case, as the declaration alleges acts by the defendant which violate the law in question if it was intended to have a general application. But since it is unnecessary for the purposes of this case to measure the extent of this statute, the question is not decided, especially as it deserves more argument and consideration.

It was urged in the argument that the law ought to encourage the reclaiming and improvement of lands which are subject to injury from the natural action of floods and surface water; and it is surprising to find this argument unquestionably relied upon in many cases which are supposed to follow the common law of surface water. The error therein is easily exposed; for to the same extent as the land of an adjoining owner is damaged by the improvement on the defendant's land, so far exactly is the development of the damaged land set back and retarded. The defendant might bring his land to perfection for his uses, and then have all that good work ruined by the first measures of improvement adopted by his less progressive neighbor. The rule contended for by the defendant would be a poor encouragement to painstaking labor engaged in reclaiming unprofitable land. Every one is charged with notice of nature's operations, but who can tell when a man will build his bulwarks against the flood? There is no public policy to allow one land-owner to improve his condition at the cost of his neighbor; but the improver must, at his peril, see to it that the benefit to himself is large enough to pay both him and his neigh-

bor's damage, if any. The law does not look to the interest of one individual, but recognizes and enforces the duties implied in his relation to others. Of course, for these principles to apply, there must be, as in this case, an invasion of some tangible right. *Feel* v. *City of Atlanta*, 85 *Ga.* 138. And it must not be understood that this discussion rules anything beyond the questions contained in this particular case. Undoubtedly there is a class of rare cases not within the general rule, as indicated by the eloquent language of Agnew, J., in Pittsburg, etc. R. Co. *v.* Gilleland, 56 Pa. St. 452, where he says : "There is therefore no liability for extraordinary floods, those unexpected visitations whose comings are not foreshadowed by the usual course of nature and must be laid to the account of Providence, whose dealings, though they may afflict, wrong no one." But such is not the case made by this declaration.

For the foregoing reasons, it is evident that the court erred in sustaining the demurrer to the declaration.

*Judgment reversed.*