## Richmond.

### Chesapeake & Ohio Railway Co. v. Meriwether and Others.

#### November 16, 1916.

1. RIPARIAN OWNERS—*Protection Against Floods—Embankments—Injury to Others—Overflows—Railroads.*—A railroad company has the right to change the location of its tracks from one part of its right of way to another along a water course, and to construct its embankments sufficiently high to protect its road bed and other property from injury by accidental and extraordinary floods, and if, as a result thereof, the property of other riparian owners is injured by such floods, no liability therefor attaches to the railroad company.

Error to a judgment of the Circuit Court of Amherst county, in an action of trespass on the case. Judgment for the plaintiffs. Defendant assigns error.

*Reversed.*

The opinion states the case.

*Harrison & Long,* for the plaintiff in error.

*Aubrey E. Strode* and *William Beasley,* for the defendants in error.

WHITTLE, J., delivered the opinion of the court.

In the trial court the positions of the parties were reversed; defendants in error were plaintiffs and the plaintiff in error defendant. The case in outline is as follows:

The alleged cause of action is that the defendant, by changing the location of its roadbed and track and building an embankment or fill along its right of way on James river in Bedford county, unlawfully narrowed the channel and lessened the space for the flow of the stream in high

water and changed its natural course, and thereby, during a freshet in the spring of 1913, flooded plaintiffs' farm on the opposite side of the river in Amherst county and its island in the river and inflicted the injuries of which they complain.  The case was tried upon that theory and result- ed in a verdict for the plaintiffs for $1,400, upon which the judgment under review was rendered.

Prior to the year 1910, the defendant's track at the point in question was located at the foot of a bluff on a sharp curve, to avoid which, during that year, the railway com- pany relocated its tracks nearer the bank of the river for the distance of 1,750 feet, in part upon the embankment of the tow-path of the old James River and Kanawha Canal Company, to whose property rights the defendant succeed- ed.   This old tow-path was twelve feet above low water mark, and the new embankment was raised to the height of twenty-five feet from the same level.

Admittedly, the change of location and increased eleva- tion of the embankment exerted no influence whatever upon the flow of the river at ordinary stage, since the base of the latter was ten feet distant from low water mark and the intervening space was traversed by a wagon road.  The low-grounds on plaintiffs' farm were only six or seven feet above low water mark.

The evidence, we think, indisputably places the freshet of 1913 in the class of "accidental or extraordinary floods," such as from the observation and experience of men of ordi- nary prudence familiar with the river would not reasonably be expected to occur.  In the memory of the oldest residents in that vicinity there had only been two other freshets that approximated the flood of 1913 in magnitude, namely, the "great freshets" of 1870 and 1877; and all of them were characterized as "extraordinarily high freshets," the high- est that had ever been seen in the river.  The records of the water power department of the railway company also

showed that the height of the water at Clifton Forge in the 1913 flood was 28.4 feet, and that it was 25 feet at the point of defendant's embankment and 24.6 feet at Lynchburg, eight miles further east. These facts in the opinion of the engineer at the head of the water department showed "a tremendous accumulation of water at Clifton Forge which caused that phenomenal rise above what had been there before, and in consequence of which the water came down in a great volume at high speed between those two points, much more so than had been at previous freshets." It was also in evidence that the freshet of 1913 rose faster, came quicker from the mountains, rose more rapidly, was swifter in flow and quicker in fall than was the case with its two great predecessors.

In these circumstances, confining our decision to such injury as was inflicted upon plaintiffs' land by reason of the construction of the embankment in its effect, if any there was, on the flood of 1913, we are of opinion that it imposed no liability on the defendant.

The case of *Cubbins* v. *Mississippi River Commission,* decided by the United States Supreme Court at October term, 1915, Adv. Op., July 15, 1916, p. 671, 241 U. S. 351, 36 S. Ct. 671, 60 L. Ed. 1041, is decisive of the questions here involved. Mr. Chief Justice White, delivering the opinion of the court in that case (after stating the general rule, "that the free flow of water in rivers was secured from undue interruption, and the respective riparian proprietors, in consequence of their right to enjoy the same, were protected from undue interference or burden created by obstructions to the flow, by deflections in its course, or any other act limiting the right to enjoy the flow, or causing additional burdens by changing it,") observes: "But while this was universally true, a limitation to the rule was also universally recognized by which individuals, in case of accidental or extraordinary floods,

8

were entitled to erect such works as would protect them from the consequences of the flood by restraining the same, and that no other riparian owner was entitled to complain of such action upon the ground of injury inflicted thereby, because all, as the result of the accidental and extraordinary condition, were entitled to the enjoyment of the common right to construct works for their own protection." The learned Chief Justice maintains these principles by reason and authority, showing that the general rule and its limitation were recognized by the Roman law, the Code Napoleon, the law of Scotland and England, and also of this country. Although in this country, he remarks, "it is true to say that much contrariety and confusion exist in the adjudged cases as to when it is applicable, some cases extending the rule so far as to virtually render the limitation inoperative, others extending the limitation to such a degree as really to cause it to abrogate the rule itself. But in these differences and contrarieties it is not at all necessary to enter, since there is no decided case, whatever may be the differences as to the application of the limitation, holding that it does not exist, and when in fact the very statement of the general rule requires it to be determined whether that rule as correctly stated would include situations which the limitation, if recognized, would exclude."

The evidence, as we view it, plainly brings this case within the influence and protection of the limitation to the general rule. The railway company was within its rights in changing the location of its tracks from one part of its right of way to another to escape the danger incident to a "14 per cent curve," and in constructing its embankment sufficiently high to protect its roadbed and other property from injury by *accidental and extraordinary floods.*.

It follows from what we have said that the judgment of the court below is erroneous and must be reversed and the

case remanded for further proceedings not inconsistent with this opinion.

SIMS, J., disenting:

I cannot concur in the view that the decision of the United States Supreme Court in the case of *Cubbins* v. *Mississippi River Commission,* cited in the majority opinion of this court, is applicable to and controls the decision of the case before us.

The former case was a suit by the owner of a piece of land on the east bank of the Mississippi river, adjacent to Memphis, Tennessee, on behalf of himself and of others owning similar land in the same locality against the Mississippi River Commission, created by act of Congress, and fifteen local State levee boards, operating on the river between Cape Girardeau, Missouri, and the mouth of the river at the Gulf of Mexico, three of these boards being organized under the laws of Missouri, four under the laws of Arkansas, one under that of Tennessee, one under the law of Mississippi and six under the law of Louisiana.

The following further statement of this case is taken from the opinion of the court:

"It was alleged that in flood seasons, when the water in the Mississippi river rose above its natural low-water banks, such water would flow out and over the vast basins in which the alluvial valley between Cape Girardeau and the Gulf formed itself, and would then, either by percolation gradually flow back into the river, or be carried over and through the basins by the streams flowing through them into the Gulf of Mexico, where such streams emptied. It was further alleged that the land of the complainant, when the river in the flood periods was thus permitted to discharge its waters, was so situated that it was beyond the reach of overflow from the river. It was then alleged

that in 1883 the Mississippi 'River Commission, acting
under the authority of Congress, had devised a plan known
as the Eads Plan, by which it was contemplated that on
both banks of the river, except at certain places, which
were stated, a line of embankment or levees would be built
which, in times of high water or flood, would hold the water
relatively within the lines of the low-water banks, thus im-
proving navigation by causing the water to deepen the bed,
and saving the country behind the levees from inundation.
It was averred that, to further this plan, the various State
levee boards, which were made defendants, were organized,
and that all of them, within the scope of·their power and
the limits of their financial ability, had aided in carrying
on this work, and that, as the result of their work and of
the levees built by the Mississippi River Commission, it
had come to pass that from Cairo to the Gulf, a distance of
about 1,050 miles, on both sides of the river, except at
points which were stated, there was a continuous line of
levees restraining the water from flowing out into the ba-
sins, as above stated, and which, in many instances, cut off
the outlets connecting the streams which drained the basins
and ultimately carried off the water to the Gulf. It was
charged that this line of levees as a whole had been vir-
tually adopted by the Mississippi River Commission, which
body had assumed control of the whole subject, and that
such body and all the State agencies co-operating were en-
gaged in strengthening, elevating, reviewing, repairing, and
increasing the lines of levees so as to more effectually ac-
complish the purpose in view.

"It was charged 'that the effect of the closing by the de-
fendants of the natural outlets along the said river, and
the confining of the flood waters between the levee system
as a whole, is to obstruct the natural high-water flow of the
water of said river in and·along its natural bed for its en-
tire length, thereby raising the level of the water to such

an extent that said flood waters, within the last five years, have attained a sufficient height to flow over complainant's land, and when there is not a high-water stage in said river, the waters of said river accumulate, flow over, and remain standing upon and over said lands of complainant to a depth of from 4 to 8 feet, so that complainant is now being interrupted in the profitable use, occupation, and enjoyment of his said land.' And it was further alleged that 'said land is being covered with superinduced additions of sand, silt, and gravel, now from 6 inches to 3 feet in depth; the houses and fences thereon are being washed away, rendering the said land and the houses thereon unfit for occupancy, driving away the tenants, doing irreparable harm and injury to said land, impairing its usefulness, causing the practical destruction thereof, and destroying its market value.'

"It was averred that to obstruct the river as alleged was a violation of the legal rights of the complainant, since he was entitled to the natural flow of the river within its natural high or low-water bed, free from interference by the acts of the defendants. Averring that no proceedings had been taken to expropriate the land, and that no offer to pay for the same had been made, and that the acts complained of constituted a taking without compensation, in violation of due process of law under the Constitution of the United States, and that there was no adequate remedy at law, the prayer was for an injunction against the Mississippi River Commission and all its officers, employees, agents, and contractors, wherever found, and against all the local levee boards and their officers, employees, agents, and contractors, perpetually prohibiting them from further building any levees, from enlarging, strengthening, repairing, or doing any act to maintain the levees already built, and for general relief.

"The bill was amended by alleging that the overflow of complainant's land, as averred, instead of having happened

within five years, had occurred within one year, and the original prayer was added to by asking that if it was found. that the injunction prayed could not be granted, the case be transferred from the equity to the law side, and be converted into a law action to recover from the Yazoo-Mississippi Delta Levee Board, the local Mississippi Board which alone of the defendants had been served, the sum of $500,000 as the value of the plantation alleged to have been wrongfully taken.

"A motion by that corporation was made to dismiss the bill on the ground that it stated no basis for relief, and in any event it alleged no ground for equitable jurisdiction, since at best, upon the theory that a cause of action was stated, there was plainly an adequate remedy at law. On the hearing the motion to dismiss was joined in by the Mississippi River Commission, and the case is here as the result of the action of the court below in dismissing the bill for want of equity."

As expressly stated by the learned and eminent judge in his opinion in such case, the subject was considered "looking at it in a two-fold aspect: First, with reference to the rights and obligations of the land owners and the power of the State to deal with the subject; and, second, with reference to the power of the United States to erect levees to confine the water for the purpose of improving navigation, as superimposed on the right of the land owners or that of the State authorities to construct such levees, if such right obtains, and if not, as independently existing in virtue of the dominant power to improve navigation vested in Congress under the Constitution."

I can but feel that what is said in such a case in reference to a situation where there was statutory provision on the subject, national and State, comprehending an immense plan of beneficial improvement, adequate to compel the general erection of levee works sufficient therefor, is not

applicable or of controlling force where there has been no legislation on the subject—no general or legislative policy on the subject, existing or declared—and where the inevitable result of allowing one proprietor to erect such works on his land to protect his property from the result of accidental or extraordinary floods would be to compel another riparian owner to erect similar works on his land as a necessary means of defense. This would result in spasmodic individual action here and there and in great hardship and injustice before any co-ordinate and efficient system on the subject could be evolved.

It will be observed that the case of *Cubbins* v. *Mississippi River Commission* applies a different rule as applicable to the question of liability of one riparian owner to another for erecting a levee or embankment by the former on his own land to protect it from the overflow of the river, from that which has heretofore obtained in Virginia, and a great number of other States.

This rule, as laid down in the case of *American Locomotive Co.* v. *Hoffman,* 105 Va. 343, 54 S. E. 25, 6 L. R. A. (N. S.) 252, 8 Ann. Cas. 773, as stated in its syllabus, is as follows:

"A lower riparian owner has no right to pen back or obstruct the flow of a water course so as to flood the lands of the upper owners * * * due care should be taken not to obstruct the natural flow, including such rises as are usual and ordinary and reasonably to be anticipated at certain seasons of the year. But a lower proprietor is not bound to take precautions against extraordinary freshets which human sagacity cannot foresee nor human experience foretell. * * *"

This rule, in each case of asserted liability against a riparian land owner for his action in building a levee or embankment for the purpose aforesaid, where injury would. be occasioned another riparian land owner only in the event of an extraordinary flood, which flood in fact occurred, re-

duces the inquiry to this: Could the flood which occurred and which occasioned the injury complained of have been foreseen or anticipated by the exercise of ordinary foresight? If the fact be that by the exercise of such foresight the defendant could have foreseen or anticipated that such a flood would occur, he is liable for the injury done by the flood resulting from such levee or embankment being erected—otherwise not; whereas, the rule of the United States Supreme Court case cited and above referred to is precisely the opposite, namely, in effect: That if the fact be that the defendant does foresee and anticipate that such a flood will occur, he may build the levee or embankment to protect his own property and he is *not* liable for the injury done by the flood resulting from such levee or embankment being erected.

The latter rule had its origin in the civil law and has not been adopted in any of the States except in Louisiana, where the civil law is in force, so far as I have been able to find. I do not understand that it is meant to say in the extract from the United States Supreme Court case contained in the quotation therefrom in the majority opinion above, that the civil law rule above referred to has been adopted generally in this country. This is made manifest by reference to the various State cases cited in such opinion as containing "the limitation" referred to. These cases are the following: *Burwell* v. *Hobson,* 12 Gratt. (53 Va.) 322, 65 Am. Dec. 247; *Cairo, V. & G. R. Co.* v. *Brevoort,* 25 L. R. A. 527, 62 Fed. 129; *Crawford* v. *Rambo,* 44 Ohio St. 279, 7 N. E. 429; *O'Connell* v. *East Tennessee, V. & G. R. Co.,* 87 Ga. 246, 13 L. R. A. 394, 27 Am. St. Rep. 246, 13 S. E. 489; *Taylor* v. *Fickas,* 64 Ind. 167, 31 Am. Rep. 114; *Shelbyville & B. Turnp. Co.* v. *Green,* 99 Ind. 205; *Mailhot* v. *Pugh,* 30 La. Ann. 1359. An examination of all of these cases shows that in no one of them, except in the Louisiana case of *Mailhot* v. *Pugh,* 30 La. Ann. 1359, was the civil law

rule under consideration adopted or applied.   Among the cases cited on this subject in such United States Supreme Court opinion is *Burwell* v. *Hobson,* 12 Gratt. (53 Va.) 322, 65 Am. Dec. 247.   The nature of that case will appear from its syllabus, which is as follows:

"H, owning lands on both sides of a creek which frequently overflowed its banks, built a dike along the south side of it, to protect his low grounds on that side of the creek; and this caused the creek to overflow the land on the north side still more.   At his death his lands were divided by commissioners, who allotted to one of his children the land on the south side of the creek, and to another, W, the land on the north side; and in their report they made no allusion to the dike.   The son receiving the land on the south side of the creek, afterwards sold it to B; and then W owning the land on the north side, commenced to build a dike on that side, to protect his lands, which would have the effect to destroy the dike built by H, and overflow the low grounds on the south side.   B then filed a bill to enjoin the building of the dike on the north side.   *Held:*

"1. B is entitled to have his dike as it was when H died, and to have his lands protected thereby; and W has no right to build a dike on his side of the creek, which would destroy the dike of B, and overflow his low grounds.

"2. Equity will interfere to prevent the building of the dike; and will compel W to abate so much of his dike already built as would injure the dike and low grounds of B."

Moncure, J., in delivering the opinion of this court in that case, said in part:

"The maxim *sic utere tuo ut alienum non laedas* emphatically applies to the case of a riparian proprietor, and is the true legal as well as moral measure of his rights. He has no right to divert the stream, or any part of it, from its accustomed course, to the injury of other persons.

9

This is a plain proposition, laid down by all the writers on the subject of water rights, and was not denied by the counsel for the appellee.

"But he contended that it is confined in its application to the ordinary course of the stream, and that a riparian proprietor may lawfully protect his property from floods, by erecting a dike or other obstruction on his own land, though its necessary effect may be to turn the superabundant water on the land of his neighbor. Such a distinction between the ordinary and extraordinary flow of a stream is not laid down or recognized by any elementary writer, nor in any adjudged case, so far as I have seen. The utmost extent to which the authorities seem to go in that direction, is, that a riparian proprietor may erect any work in order to prevent his land being overflowed by any change of the natural state of the stream, and to prevent its old course from being altered. Angell on Water Courses, sec. 333. But he has no right, for his greater convenience and benefit, to build any thing which, in times of ordinary flood, will throw the water on the grounds of another proprietor, so as to overflow and injure them. *Id.* sec. 334. If, in the case of such an obstruction, it appears that the injury therefrom arose from causes which might have been foreseen, such as ordinary periodical freshets, he is liable for the damage. *Id.* sec. 349. That the supposed distinction does not exist was expressly decided by the Court of King's Bench in *Rex* v. *Trafford,* 20 Eng. C. L. R. 498. Tenterden, C. J., in delivering the judgment of the court in that case, said, 'Now it has long been established that the ordinary course of water cannot be lawfully changed or obstructed for the benefit of one class of persons to the injury of another. Unless, therefore, a sound distinction can be made between the ordinary course of water flowing in a bounded channel at all usual seasons, and the extraordinary course which its superabundant

quantity has been accustomed to take at particular seasons, the creation and continuance of these fenders cannot be justified. No case was cited, or has been found, that will support such a distinction.' *Id.* 502. The judgment in that case was reversed in the Exchequer Chamber. *Trafford* v. *Rex*, 21 Eng. C. L. R. 272. But that court agreed in the principle laid down by the Court of King's Bench, though it did not discover, upon the special verdict, a finding of sufficient facts to warrant its application to the case.

"It is often the mutual interest of adjacent riparian proprietors to agree to erect works on their respective lands to protect them against floods, and keep the water at all times in its natural channel. That interest is generally sufficient to bring them to such an agreement. But in the absence of agreement express or implied, or of any statutory provision on the subject, the law affords no means of compelling the erection of such works, however beneficial they might be to the proprietors or the public, and will not allow one proprietor, by erecting such works on his land, to compel another to erect similar works on his as a necessary means of defense. Each has the exclusive right to judge and act for himself on this subject; taking care not to injure the property of the other."

The last paragraph of this quotation is especially pertinent to the question under consideration, namely, whether the civil law rule applied in the United States Supreme Court case above cited, is properly applicable in this State, where there is an "absence * * * of any statutory provision on the subject," and where "the law furnishes no means of compelling the erection of such works, however beneficial they might be to the proprietors or the public," and where I think the law, as it still is, "will not allow one proprietor, by erecting such works on his land, to compel another to erect similar works on his as a necessary means of defense."

It would seem that where "a limitation" is referred to in the opinion of the United States Supreme Court case above mentioned, and where it is said, "In this country it is also certain that the limitation is recognized," it is meant merely to say that there is in all countries "a limitation" in some form placed upon the liability of individuals for erecting "such works as would protect them from the consequences of a flood by restraining the same." It was not meant to say, because that would have been contrary to the fact, that in all countries, including our States, the civil law rule above referred to is applied. This statement does not controvert the fact, which is the fact, that in most of our States "the limitation" upon such liability is fixed by the rule in Virginia above adverted to.

It may be noted in passing that Indiana puts into effect "a limitation" such as above referred to by considering the flood waters of rivers extending beyond their ordinary channel as surface waters, and applying the common law rule with respect to surface waters thereto, namely, that each land owner affected thereby may fight such waters as a "common enemy"; and hence deduces the result that in that State a riparian owner may erect an embankment on his own land to ward off the flood waters both of ordinary and extraordinary floods from overflowing his lands (see Indiana cases cited in *Cubbins* v. *Mississippi River Commision, supra*); which is not the rule in Virginia, nor is it the rule of the civil law applied in the *Cubbins' Case.*

Again: I do not think the case before this court is one where the erection of the embankment by the defendant was in furtherance of any purpose to fight a "common enemy," such as the sea or extraordinary floods, by restraining them within their banks—which is contemplated by the civil law rule above referred to, and to those entertaining which purpose alone such civil law rule extended its protection against individual liability for damages. The purpose-

of the defendant in the case before us was undoubtedly "not to keep the water within the bed of the river for the purpose of preventing destruction to the valley lying beyond its bed and banks," which was the purpose the civil law rule was intended to conserve (see *Cubbins* v. *Mississippi River Commission, supra,* at p. 676) ; but it constructed its embankment for its individual benefit alone, without any idea of public benefit. As is said in the case of *Pappenheim* v. *Metropolitan, &c. Co.,* 128 N. Y. 436, 28 N. E. 518, 13 L. R. A. 401, 26 Am. St. Rep. 486, in reference to a defendant claiming immunity under a Georgia statute authorizing a general system of levees on unnavigable streams (having a like public beneficial purpose to that of the civil law rule adverted to above) it "constructed an embankment on which to lay its track, without regard to any consequences of benefit or injury to the contiguous country."

For the reasons given above, I do not think that the case of *Cubbins* v. *Mississippi River Commission, supra,* is applicable to and should control the decision of the case before us. And since its application to such a case makes such a radical and far-reaching change in the law of Virginia on the subject, I feel constrained to note my dissent from the majority opinion, although I am of opinion that the assignment of error relied on by counsel for defendant with respect to instruction No. 7, given by the court below, is well taken and that the case should be reversed on that ground, if not upon others.

Instruction No. 7 was as follows: "If the jury believe from the evidence that the embankment on the new location of the track opposite the lands of the plaintiffs narrowed the natural channel of the waters of the river at normal stages, and at such flood stages as are defined in others of these instructions, and that by reason of such embankment damage accrued to the lands of the plaintiffs,

then as a matter of law the defendant was guilty of negligence as contemplated by these instructions and the defendant is liable in damages for the loss so caused to the plaintiffs."

This instruction concluded with a direction of a verdict for the plaintiffs in effect. Flood stages of ordinary as well as extraordinary floods are defined in others of the instructions. This instruction, therefore, in effect directed a verdict for plaintiffs, although the jury found from the evidence that damage accrued to the lands of the plaintiffs only from an extraordinary flood of a character which would not have been foreseen or anticipated by the exercise of ordinary and reasonable foresight on the part of defendant.

As this is a minority opinion it is unnecessary for it to discuss any other assignment of error.

*Reversed.*