HUERTH, Respondent, vs. TOWN OF PRAIRIE DU SAC, Appellant.

*January 12—February 17, 1948.*

For the appellant there was a brief by *Langer & Cross* of Baraboo, and *C. G. Mathys* of Madison, and oral argument by *Mr. Mathys* and *Mr. H. M. Langer*.

For the respondent there was a brief by *Hill, Miller & Hill* of Baraboo, and *Hill, Beckwith & Harrington* of Madison, and oral argument by *James H. Hill, Jr.*

FAIRCHILD, J. The facts disclosed on the former appeal are the same as those now presented. *Huerth v. Prairie du Sac,* 246 Wis. 25, 16 N. W. (2d) 422. They concern the use of land by respondent for the growing and harvesting of hay; the disturbance of drainage of that land by the construction of roads by the town; and the effect on respondent's crops of the resulting soaking and saturation of the land. The land involved is marshland along the Wisconsin river in the town

of Prairie du Sac. In 1913, individuals owning land in this vicinity dug a private drainage ditch running east and west across the marsh. The ditch is from two to three feet deep and drains to the west. In 1935, the plaintiff bought a half section of this marshland which he had previously operated as a renter. There was then a north-south road running down into the marsh a quarter mile to the west of Huerth's land, which will be referred to as the West road. Between 1933 and 1935 work was done on that road to raise its level and to lengthen it to the south so that it ran down into the marsh parallel to the west boundary of Huerth's land. In 1936, another road, running east and west, was begun. This road was laid out immediately north of the ditch. It will be referred to as the North road. It intersected the West road at a point near the northwest corner of Huerth's land.

At one time there was a culvert across the West road at a point south of what later became the intersection. A spillway was built over the culvert. Sometime after the changes were made in the West road and after the North road was built, another culvert was put in where the spillway was. By that time the old culvert on which the spillway had been built had disappeared. The new culvert was put in on top of the spillway. Its base was thus about one foot higher than the bottom of the ditch.

During the years 1938–1940 the respondent's land was so saturated that he could not raise the sort of crop of marsh hay which he had been able to raise before the road building had been done. It is his contention that the West road and the North road form a dyke which blocks the natural drainage of the surface waters from his land. More specifically, he contends that the town violated sec. 88.38, Stats. 1941, in failing to provide a properly placed and effective culvert at the intersection of the roads. That section reads as follows:

"*Culverts and outlets to permit natural drainage.* (1) Whenever any county, town, city, village or railway company

shall have heretofore constructed and now maintains or here-
after shall construct and maintain any public highway or road
grade through, over and across any marsh, lowland or other
natural depression over or through which surface water natu-
rally flows and percolates, and the stopping of the said flow and
percolation of said water by said highway or road grade causes
any crop or land to be flooded, watersoaked or otherwise dam-
aged, such county, town, city, village or railway company shall
construct, provide and at all times maintain a sufficient ditch
or ditches, culverts or other outlets to allow the free and unob-
structed flow and percolation of said water from said lands,
and to prevent said lands from becoming flooded, watersoaked
or otherwise damaged by said water. Provided, however,
that the foregoing shall not apply to public highways or road
grades now or hereafter used to hold and retain water for
cranberry purposes.

"(2) Any county, town, city, village, or railway company
which shall fail to provide such necessary ditches or culverts
or other outlets shall be liable for all damages caused by reason
of such failure or neglect."

The appellant contends that the trial court should have in-
structed the jury that the water collected in the drainage ditch
had ceased to be the naturally flowing and percolating surface
water to which the statute applies. The requested instruction
was properly refused. The effect of such an instruction vir-
tually would have been that there was no jury question about
the town's responsiblity for providing adequate drainage
through the road for the water in the ditch, and that result
would have been contrary to what became the law of the case
on the former appeal.

Sec. 88.38, Stats., requires that culverts and outlets be main-
tained to allow the free and unobstructed flow of surface wa-
ters. The ditch referred to is one that was constructed years
ago by the enterprise of private owners in the interest of
coping with surface waters and accelerating the movement of
those waters in the direction of the natural drainage. Legis-
latures have for many years recognized the practical value
of drainage ditches. They have made provisions well calcu-

lated to protect land likely to be affected by surface waters and to protect existing ditches against any act which would destroy their efficiency. The Farm Drainage Law, ch. 83, Stats., illustrates such a purpose. See sec. 88.32, Stats. 1941. The waters moving through the ditch in question are moving toward a point they would naturally reach if the ditch was not there. There is evidence, including the testimony of two engineers, that the general flow or surface drainage from respondent's land is toward the north and west and that its course is crossed by the embankment formed by the North and West roads. Surface waters were present, and what had theretofore been their natural drainage was obstructed by the roads. It is the obstruction of that drainage of which the respondent has a right to complain.

The facts disclosed in relation to the ditch did not warrant an instruction to the jury which would prevent caring for surface water as sec. 88.38, Stats., requires. Admittedly respondent's land was seasonally flooded by waters of the Wisconsin river. Sec. 88.38 imposes no duty upon the town to provide for the drainage through its roads of such waters. On this matter the trial court instructed the jury as follows:

"It is not the duty of the town to provide for drainage of floodwaters from the Wisconsin river which overflows the plaintiff's land, but after such floodwaters have receded from the land, the plaintiff has the right to the maintenance of drainage that will permit the percolation, seepage and runoff of the resulting saturating waters to the same extent and in the same manner that such waters were drained off before the construction of the roads."

It is claimed that this instruction was erroneous because it allowed residual floodwaters to be considered as surface water. There is much authority supporting the consideration of residual floodwaters as surface waters. *Anderson v. Chicago, B. & Q. R. Co.* 102 Neb. 497, 167 N. W. 559, 560; *O'Connell v. East Tennessee, Va. & Ga. R. Co.* 87 Ga. 246, 13 S. E. 489,

13 L. R. A. 394, 27 Am. St. Rep. 246; 27 R. C. L., p. 1138, sec. 68.

As to the contention that floodwaters and the residual floodwater trapped on this land are so mixed with surface water that the respondent's damages cannot be established with requisite certainty, it is to be pointed out that seasonal high water would not in and of itself excuse damming up ground or surface water. The evidence is that before the obstruction resulting from the town's construction of the intersecting roads, the waters from ordinary seasonal floods due to high water in the Wisconsin river came and disappeared in time for the hay crop to mature and be harvested. The jury was entitled to and did believe that it was not the floodwaters which caused the damage to respondent's crops. The questions with which the jury was concerned related directly to the presence of surface water and the neglect or refusal of the town to provide for drainage through its roads. The court instructed the jury,

"This legal obligation of a township relates to the drainage of surface water which naturally flows, filters or percolates over or through the land. . . . The township must provide drainage under or through the highway or road grade sufficient to conduct away in safety the rainfall which usually occurs in this climate. . . . In this case the plaintiff is entitled to be provided with drainage facilities under or through the roads in question which will be adequate to maintain the same drainage that existed before the construction of such roads and the reconstruction of the culverts."

Under the circumstances of this case there was no prejudicial error in the court's charge.

It was suggested upon the argument that the jury had not been properly instructed as to the market value of the hay. The testimony sets forth the extent of the injury, the acreage and value per acre of the crops destroyed. This testimony was directed to the value of a standing crop. The instructions to the jury upon that point were sufficient.

By the Court.—Judgment affirmed.