[Filed April 4, 1888.]

## JOSIAH WEST, APPELLANT, *v.* E. A. TAYLOR AND JAMES TAYLOR, RESPONDENTS.

WATER-COURSE — RIGHTS OF CONTERMINOUS PROPRIETORS AS TO SURFACE WATER NOT DECIDED. — The authorities on the subject are not harmonious, and the facts not rendering it necessary, the question not determined.

SURFACE WATER — WHAT NOT. — The water flowing out of Cullaby Lake and seeking an outlet by the Skipanon is not *surface water.*

WATER-COURSE — WHAT IS — DOES NOT CEASE TO BE, BY SPREADING. — A stream does not cease to be a water-course and become *mere surface* water because at certain points it spreads over a level meadow several rods in width, and flows for a distance without defined banks before flowing again in a definite channel.

APPEAL from Clatsop County.

*J. Q. A. Bowlby, R. Stott,* and *J. B. Waldo,* for Appellant.

*Fulton Brothers,* for Respondents.

STRAHAN, J. — The object of this suit is to restrain the defendants from maintaining or repairing a certain dike or dam erected by them on their own lands in Clatsop County, Oregon, whereby the waters accumulating and flowing out of Cullaby Lake are caused to flow back upon the plaintiff's lands, by means of which their use for agriculture or pasturage is entirely destroyed.

The facts as they appear from the evidence are about as follows: The plaintiff owns a large body of land adjacent to Cullaby Lake, in Clatsop County, Oregon. This lake is about two miles long and upon an average about one half mile wide, and is fed by perennial springs and a mountain stream five or six miles long, which flows into the lake at its southern extremity, and is called Clatsop Creek; for two miles south of the lake it is a deep, sluggish creek, and is of the depth of from nine to ten feet. Prior to 1877, the main outlet to the lake was Neacoxie Creek, into which the waters of said lake flowed at ordinary. stages. From the western part of the lake, Neacoxie Creek flowed in a northwest course for about four miles; it then curved sharply to the westward, and from thence in a southerly direction along the coast; many miles south of the source of the lake it empties into Okanna Creek which flows into the Pacific Ocean. About the year 1877, the sand drifted into Neacoxie Creek in such quantities that its channel became choked up and it' entirely ceased to be an outlet for the waters of said lake. This result was produced solely by natural causes. During high water at all times Neacoxie Creek was insufficient as an outlet for the constantly accumulating waters of said lake, but after it became filled and choked with sand, the waters of said lake have flowed out at the northern portion thereof, a part of which spread out over the lands of the defendant and others lying north of said lake, while the greater portion thereof finally gained an outlet into Skipanon Creek which empties into Young's Bay. There is no well defined water-way from Cullaby Lake to Skipanon Creek extending over the entire distance, but over the greater portion thereof there extend "swales, marshes, depressions, or hollows," into which the water flows during the greater part of the year, with a continuous current northward to

the Skipanon. The inclination of the surface from Cullaby Lake to the Skipanon is not great, but is enough to carry the water if left unobstructed from one point to the other. For the purpose of restraining the waters of Cullaby Lake from spreading over the defendants' land the dike in question was constructed. It is two feet eight and one half inches high, and its erection has raised the waters above and south of it high enough to overflow from three to four hundred acres of the plaintiff's land, and about one thousand acres in all, which were not previously covered by water. Before the erection of said dike, the defendants and others, for the purpose of reclaiming their lands, had dug two ditches from Skipanon Creek, extending up to or near the north end of the lake, so that a large portion of the overflow of the lake was carried off by means of these ditches.

A well informed witness describes the situation thus:—

"Int. 4, p. 5. How many natural outlets are there from that lake?

"Ans. I should say for quite a number of years back the only natural outlet or inlet at all that I know of has been through the marsh. By the marsh I mean what is marked Ex. A, as marsh between Cullaby Lake and Skipanon Creek; the water escapes over and through the marsh; the ground appears to be porous and in some places appears to be floating and allows the water to flow partially under the marsh; joining the main-land the water seems to be deeper than in any other part of the marsh, that is on the west side of the marsh; in former times there seems to have been another partial outlet; since about the year 1877, this has been the only outlet that I know of; I don't know what was the outlet before 1877; don't think I ever was in the marsh prior to 1877; have seen the marsh several times lately; there is a dike or dam on the south line of the James Taylor claim or close to the line.

"Int. 5, p. 6. State what effect, if any, was had upon the land?

"A. As long as the dam held it forced the water back upon the lake and adjacent marshes; it overflowed the land of plaint-

iff partially; it is a damage to plaintiff's land, but how much I cannot say; the overflow of these lands interfered with the use of them.

"A. to Int. 2, p. 19.   At the present time there is what is called the little ditch, between which and the slough which I speak of is high or marsh land, of perhaps a rod in width or more; what I mean by the slough is clearer water than the rest of the marsh, the rest of the marsh having brush and grass growing upon it; it is, I should judge, about a rod in width; it is too deep to wade; soft bottom; it has a slight current to the north."

"Cross-question, p. 20.   Is it not in many places entirely grown up with brush and crab-apples?

"Ans.   Not so but I could get through with a boat.

"Int. 22, p. 22.   What did you ever go along the west side of the marsh on defendants' land in a boat through this slough you speak of for?

"A.   I had shot a duck in it and I got Carnham's boat and got it.   I was through there two years ago.

"Int. 13.   How far through defendants' land did you go in what you call a slough in a boat?

"A.   About half way through."

Another witness, R. W. Morrison, amongst other things testified as follows:—

"Ans. to Int. 1, p. 31.   The marsh running across the east portion of my claim is as follows: Through my lands there are two branches of marsh.   Between these branches there is a ridge of land.   The marshes are branches of the portion of the marsh that is south and joins Cullaby Lake.   There is a good deal of water going down these marshes at present, but most of it is going through ditches that have been cut through the marshes. By down I mean north, coming from Cullaby Lake and flowing in a northerly direction.

"Int. 2.   How long ago were these ditches dug?

"A.   The one in the west arm must have been dug some six or eight years ago.   The one in the east, dug some years later.

"Int. 3, p. 32.   What was the condition of these arms before the ditches were dug?

"A.   In the winter time they were flooded.   In the summer time, years ago, they were dry, that is, there was no running water or standing water except in low places.   On my place I did not think there was any water that stood all summer except on the east marsh.   There was a small channel that sometimes was above ground, and sometimes you would not see it for running under the trees.   It would run under ground for a rod or two occasionally, and then appear on the surface again.   This little channel stands in near the south line of my claim.

"Int. 4, p. 33.   In what direction did the water in any of those marshes run prior to the digging of those ditches?

"A.   The same course as in the ditches.   The east marsh empties into Skipanon and the west marsh into the Skipanon.

"Int. 7, p. 34.   For how many years has the water run down the arms of that marsh during the winter season?

"A.   As many years as I have lived there."

Mr. Philip Condit, also another witness, thus describes the condition of the water between Cullaby Lake and Skipanon Creek:—

"Int. 2.   Are you acquainted with Cullaby Lake?

"Ans.   Yes sir; have been acquainted with it pretty well for fifteen years; am acquainted with the lands and waters between it and the Skipanon; along through the marsh in 1874 the water was running through them some; this was in the winter season; late in November there seemed to be considerable water running through; the water was running across Mr. Morrison's, the Hobson place, and the Taylor place; all the water was running north towards the Skipanon; there seemed to be a small channel most of the way; but after you get up to the Carnham marsh there did not seem to be any well defined channel; the water spread over the marsh; this cranberry marsh is on the Hobson place and on the Taylor place; sometime I would go clear through to Cullaby Lake.

"Int. 3.   Which was the water coming from?

"A.   From Cullaby Lake.

"Int. 5.   Where did the water come from?

"A.   It came from Cullaby Lake."

The general inclination of the earth's surface from the north end of Cullaby Lake to the Skipanon is slightly downward, so that the water flowing out of said lake at the north end would naturally flow into Skipanon Creek, so that for more than twenty-five years, in cases of freshets, the water escaping from this part of the lake has found an outlet through Skipanon Creek.   It also appears from the evidence given by A. G. Wirt that as early as 1852, the waters of the lake were accustomed to overflow at the north end thereof, and run down through the marsh across Taylor and Hobson's claims to Skipanon, and that the water from the lake then flowed through what was called the "back marsh" all the time, except about three months in each year—the dry season—during which time "it did not run but a trifle."   Some of the witnesses refer to these water-ways as "swales," some call them "marshes," while others call them "depressions" or "hollows"; but by whatever name known or called, they aided very materially in conveying the large portions of the water escaping from the lake to the Skipanon.

*Water-course.*   Whatever may be the rights of conterminous proprietors as to the flow of mere surface water, I do not think it now necessary to consider or determine.   The authorities on the subject are not harmonious, and the view I have taken of the facts renders the consideration of that question unnecessary at this time.   The water flowing out of Cullaby Lake and seeking an outlet by the Skipanon is not *surface water.*   In *Macomber* v. *Godfrey,* 108 Mass. 219; 11 Am. Rep. 349, it is said: "But the defendant contends that because at a point on his land about five rods above the· plaintiff's lands, the water spreads out over the surface, covering a space of a few rods in width, and thus runs upon and across the plaintiff's land, which is a level meadow, and covers the same for several rods in width, irrigating it in a valuable manner through its whole length, being about seven rods, and during this whole length of twelve rods has no defined channel, it ceases to be a water-course, and is to be regarded as surface water, to the flow of which the plaintiff

has no right. If the whole of the stream had sunk into the defendant's soil and no water remained to pass to the plaintiff's land except under the surface, it would have ceased to be a water-course, and the plaintiff would have had no right to it (*Broadbent* v. *Ramsbotham*, 11 Ex. 602; *Buffum* v. *Harris*, 5 R. I. 243), or if the water had only flowed in temporary outbursts, caused by melting snow or by rain, it would have been surface water, as in *Ashley* v. *Walcott*, 11 Cush. 192. The defendant might have diverted it, and the plaintiff might have raised barriers on his land to prevent its flowing upon their lot below. (*Gannon* v. *Hardagon*, 10 Allen, 106; 87 Am. Dec. 625; *Franklin* v. *Fisk*, 13 Allen, 211; 90 Am. Dec. 194.) But where, owing to the level character of the land, it spreads out over a wide space without any apparent bank, yet usually flows in a continuous current and passes over the surface to the lands below, it still continues to be a water-course." (*Gillett* v. *Johnson*, 30 Conn. 180.) So in a somewhat analogous case (*Palmer* v. *Waddell*, 22 Kan. 352) it is said: "If the face of the country is such as necessarily collects in one body so large a quantity of water after the heavy rains or melting snows as to require an outlet to some common reservoir, and if said water is regularly discharged through a well defined channel which the force of the water has made for itself, and which is the accustomed channel through which it flows, and has flowed from time immemorial, such channel is a natural water-course." And Gould on Waters, section 264, is to the same effect. It is there laid down as an elementary principle that "a stream does not cease to be a water-course and become mere surface water, because at a certain point it spreads over a level meadow several rods in width, and flows for a distance without defined banks before flowing again in a definite channel." So, also, in *Shields* v. *Arndt*, 3 Green Ch. 246, the same principle in effect was thus stated: "A spring on the defendant's land, sixteen rods from the land of the plaintiff, supplied a small stream of water that ran to the plaintiff's land, the water as it came from the spring being sufficient to fill a half-inch pipe, and the flow being constant and nearly uniform except in very dry times, when it

failed to run. For seven rods the stream descended rapidly in a well defined course to a piece of marshy ground, when it spread so that its flow was slight and not sufficient to break the turf, but was generally sufficient to form a continuous sluggish current along the surface in a natural depression to a watering place within the plaintiff's line. This was adjudged to be a *water-course* within the meaning attached in law to that term."

That the water in question is something more and different from mere *surface water* is evident. It is water which has accumulated from spring rains and melting snows, and which has flowed for several miles between regular banks of a well defined water-course. Its accumulation in Cullaby Lake is constant, and an outlet for it is absolutely necessary, or the whole region thereabout must be inundated. Neacoxie Creek is entirely closed, and of necessity the accumulating waters have flowed across the defendants' lands. It seems to me that in such a case the flowage must be deemed a *water-course* and not mere surface water, and therefore, the erection or maintenance of the dike in question is unlawful. In reaching this conclusion I have expressly avoided the consideration of the doctrine of dominant and servient heritage of the civil law respecting the natural flow of surface water (*Hoyt* v. *City of Hudson*, 27 Wis. 656), or whether or not the rule of the common law is the same. (*Bellows* v. *Sackett*, 15 Barb. 96.) These are questions which must attract the consideration of this court when a case shall be presented requiring their determination; but this case is decided on other and different principles.

It follows that there must be a decree in favor of the plaintiff perpetually enjoining the maintenance or repair of the dike mentioned in the complaint; but inasmuch as the questions litigated are to some extent of a public nature, and the defendants acted in good faith in the premises, neither party will be allowed costs against the other.