Submitted on briefs September 25, affirmed October 9, 1923.

## HAYES ET AL. *v.* ADAMS ET AL.

### (218 Pac. 933.)

**Waters and Watercourses—Underground Stream Constituting "Watercourse" as Distinguished from "Percolating Waters" Defined.**

1. Water flowing underground in a constant stream in a known and well-defined natural channel, however small, but reasonably ascertainable from the surface, without excavation, constitutes a "watercourse," and not "percolating water."

**Waters and Watercourses—Diversion of Underground Stream not Governed by Law of Percolating Waters.**

2. Diversion of waters of an underground stream is governed by the law applicable to surface streams; and not that of percolating waters.

**Waters and Watercourses—Conclusion of Existence of Subsurface Watercourse Supplying a Spring, Authorized.**

3. Conditions shown *held* to authorize conclusion of the existence of a subsurface watercourse supplying a spring.

**Waters and Watercourses—Diverting Waters of Underground Stream Supplying Spring, Invasion of Granted Right to Free and Unrestricted Use of Spring.**

4. It was an unwarranted invasion of plaintiff's rights to the free and unrestricted use of a spring granted by defendants for defendants to dig a ditch, knowing it would divert the waters of the underground stream supplying the spring.

From Marion: GEORGE G. BINGHAM, Judge.

In Banc.

AFFIRMED.

For appellants there was a brief over the names of *Mr. Blaine McCord* and *Messrs. Carson & Carson.*

For respondents there was a brief over the names of *Mr. H. Overton and Messrs. Smith & Shields.*

McCOURT, J.—The plaintiffs commenced this suit to restrain and enjoin defendants from in any manner

---

1. What are percolating waters, see note in 67 Am. St. Rep. 663. Distinguishing character of watercourse, see note in 1 L. R. A. (N. S.) 756.

interfering with plaintiffs' use of a certain spring, to which the defendants had theretofore granted plaintiffs the free and unrestricted use, and from in any manner interfering with, or diverting, the underground stream or streams of water which feed the spring in question. A trial resulted in a decree for plaintiffs, and defendants appeal.

On and prior to the tenth day of March 1914, the date of the deed hereinafter mentioned, defendants were the owners of Lots Fifteen and Sixteen in the platted tract known as Woodburn Fruit Farms, in Marion County, Oregon, and plaintiffs owned Lot Seventeen in the same subdivision. The lots mentioned each contained ten acres of unimproved stump land.

For the purpose of securing a suitable site upon which to build a dwelling-house, barn and other buildings, plaintiffs, about the last-mentioned date, entered into negotiations with defendants for the purchase of a three-acre tract in the southeast corner of Lot Sixteen and also the right to the use of a spring which would furnish a supply of water to plaintiffs for household, domestic and other purposes upon said three-acre tract.

The spring, the right to use which plaintiffs sought to acquire, is located on said Lot Sixteen, near the center of the north and south line between Lots Fifteen and Sixteen, and about 160 feet north of the three-acre tract mentioned. The negotiations between plaintiffs and defendants culminated in a warranty deed, whereby defendants conveyed and granted to plaintiffs a three-acre tract, thirty rods long and sixteen rods wide, out of the southeast corner of Lot Sixteen, Woodburn Fruit Farms, ''together with the

free and unrestricted use of a certain spring near the center of the west line of said Lot Sixteen (16).''

The spring in question is located near the mouth of a deep canyon or draw, which extends northerly from the spring to, and beyond, the north line of Lot Sixteen. At the time of the conveyance by defendants to plaintiffs, no beneficial use had been made of the spring, or of any waters which found their way into the canyon above the spring. The bed of the canyon above the spring contains many wet, boggy places, and along its banks, rushes and other vegetation grow, indicating the presence and course of a small underground stream. The top soil in the bed of the canyon is loose, and water readily flows through the same. It is heavily mixed with twigs and vegetation, and varies in depth from one to four feet. This top soil rests upon a stratum of clay or bedrock which is impervious to water.

When plaintiffs acquired the right to use the spring, the soil was wet and boggy for some distance in every direction from the place where the water flowed to the surface of the canyon and formed the spring. In the summer and fall of 1914, plaintiffs removed the earth and slime that had accumulated about the spring, by excavating to the bedrock, and in the space so excavated, placed and installed a box or curbing about four feet square and four feet deep. The vein or stream of water which fed the spring then flowed into the box or curbing through an opening at the bottom thereof and spilled over the top on the opposite side.

A few days after plaintiffs had set the box or curbing, they discovered that for some reason the water flowing into the box was discolored and muddy. On investigation they discovered that defendants'

hogs had been wallowing in a wet place in the bottom of the canyon some distance above the spring, thereby intercepting and polluting the underground stream before it reached the spring. Plaintiffs then excavated a ditch from the spring up the canyon a distance of two hundred feet or more, following the course of the underground stream that supplied the spring, and laid therein a line of four-inch tile. In order to reach bedrock upon which the underground stream flowed, plaintiffs were required to excavate to a depth varying from sixteen inches to four feet. When plaintiffs had laid the line of tiling in the bed and course of the underground stream mentioned, they filled the ditch which they had excavated, and covered the tile laid therein, and left the bed of the canyon in such a condition that the surface waters flowing therein during the wet and rainy season tended to flow along the bank of the canyon farthest from the line of tiling.

Soon after plaintiffs commenced to excavate in the canyon for the purpose of laying the tiling, as aforesaid and when such excavation had proceeded but a short distance, the defendant Clarence A. Adams was present, and being advised of the intention and purpose of plaintiffs to lay a line of tiling along the underground stream which fed the spring to collect and carry the waters of the stream unpolluted and undefiled into the spring, the defendant Adams expressly authorized plaintiffs to lay the tiling as proposed by them, upon the single condition that plaintiffs should not leave an open ditch in which stock might be entrapped.

After the tiling was laid, as aforesaid, the water flowing into the curbing at the spring was clear, ex-

cept when a large volume of surface waters flowed down the canyon during, or after, a heavy rain.

The installation of the curbing or box at the spring and the laying of the tile line above described, were necessary to enable plaintiffs to utilize the water of the spring and enjoy the rights granted them by their deed from defendants. Plaintiffs erected an onion-house upon the three-acre tract in 1914, at a cost of $300; during 1915 and 1916 they removed the stumps, and reduced the land to cultivation; in 1917 they erected a barn on the premises at a cost of $700 and a dwelling-house at a cost of $2,000. The dwelling-house was equipped with a system of water-pipes connecting with a sink, bathtub and other like fixtures for the use of running-water. Plaintiffs also installed a 300-gallon tank upon the top of the barn and an overflow tank, having a capacity of fifty gallons, at the side of the barn, and connected these tanks by piping with the water-pipes in the dwelling-house.

Plaintiffs at the same time installed an hydraulic ram in the canyon below the spring and about twenty feet therefrom, and connected the ram with the spring by a line of tiling and piping from the top of the curbing about the spring. Plaintiffs then ran a line of water-pipe, more than 300 feet in length, from the hydraulic ram to the tank at the top of the barn. The water flowing from the spring to the ram operated the same and raised water to the tank above mentioned, and furnished plaintiffs with an adequate supply of wholesome water for household and domestic use and also for watering stock.

The evidence, particularly that of the defendants, disclosed that only one-twelfth of the water that flowed to plaintiffs' hydraulic ram was raised or pumped by the operation of the ram into plaintiffs'

storage tank and water system, and that the remaining eleven twelfths of the water which passed through the ram flowed on down the canyon.

Plaintiffs continued to use the water from the spring in the manner mentioned until November, 1922, when defendants, with the avowed purpose of obtaining a supply of water for domestic use in connection with buildings which they had erected, or proposed to erect, upon their own land, caused a ditch to be dug and excavated "along the bed" of the canyon and "along the natural course of the water flowing down such canyon" and "roughly parallel" with plaintiffs' line of tile laid in said canyon as aforesaid. The bottom of the ditch excavated by defendants was slightly lower than plaintiffs' line of tiling, and at some places was not farther than ten inches from the line of tiling, and at no place was farther than four feet therefrom, except at the curbing, where it was six or eight feet distant.

The ditch so excavated by defendants had the effect of diverting the underground stream from plaintiffs' tile line into defendants' ditch and out of its usual and natural course to the curbing at the spring, thereby depriving plaintiffs of the use of the spring. The defendant Clarence A. Adams testified that at one place a stream "runs like your wrist" from plaintiffs' tiling.

When defendants' ditch had been excavated, plaintiffs' hydraulic ram ceased to run, and thereafter the spring did not furnish a sufficient supply of water to operate the same or for use upon the three-acre tract conveyed by defendants to plaintiffs.

A small canyon extending in an easterly and westerly direction intersects the canyon in which the spring in suit is located, a short distance below plain-

tiffs' hydraulic ram. Defendants alleged in their answer and testified at the hearing that their object in excavating the ditch above described was to collect at a point near the union of the two canyons mentioned, the water from the springs or boggy places along the two canyons, except from the spring and curbing claimed by plaintiffs, and there install a ram for the purpose of providing water for domestic use to the buildings of defendants.

The evidence clearly established that any water flowing out of plaintiffs' spring, or the curbing surrounding the same, in excess of that pumped by plaintiffs' hydraulic ram, would flow down the canyon and might be used by defendants for the purpose of operating the ram which they professed an intention to install.

It is obvious that defendants could have secured the desired water supply without diverting the water that flowed into the spring or materially interfering with the same.

1, 2. Defendants justify their interference with, and diversion of, the waters which supply the spring in question upon the ground that the intercepted waters are subterranean, percolating waters, the course of which is unknown and unascertainable. They invoke the rule recognized by all the authorities, that such waters are a constituent part of the land, and belong to the owner of the land, with the right in such owner to make any reasonable use thereof, including a use which, either by reason of its character or the manner of its exercise, cuts off or diverts the flow of percolating waters from his neighbor's spring and renders the same dry and useless: *Taylor* v. *Welch,* 6 Or. 199; *West* v. *Taylor,* 16 Or. 165, 171 (13 Pac. 665); *Boyce* v. *Cupper,* 37 Or. 256, 260 (61 Pac. 642);

*Wheelock* v. *Jacobs,* 70 Vt. 162 (40 Atl. 41, 67 Am. St. Rep. 659, and note p. 663, 43 L. R. A. 105); Farnham on Waters, § 935; Gould on Waters (3 ed.), § 280.

The above rule, however, does not extend to water which flows underground in a constant stream in a known and well-defined natural channel. Waters flowing in that manner and in such a channel are not percolating waters, within the scope of the rule upon which defendants rely, but constitute a natural watercourse, rights in or to the waters of which, are governed by the rules of law applicable to surface streams: *West* v. *Taylor,* 16 Or. 165 (13 Pac. 665); *Taylor* v. *Welch,* 6 Or. 199; *Shively* v. *Hume,* 10 Or. 76; Gould on Waters (3 ed.), § 281; Farnham on Waters, § 944; 27 R. C. L. 1170.

A constant stream of water, however small, flowing in a definite channel, with bed and banks, whether above or below the earth's surface, is a watercourse: *Simmons* v. *Winters,* 21 Or. 35 (27 Pac. 7, 28 Am. St. Rep. 727); *Borman* v. *Blackmon,* 60 Or. 304 (118 Pac. 848); *Hansen* v. *Crouch,* 98 Or. 141, 145 (193 Pac. 454); *State* v. *Hawk,* 105 Or. 319, 333 (208 Pac. 709, 209 Pac. 607); also see cases collected in note, 67 Am. St. Rep. 664. But, to render a subsurface stream subject to the rules of law applicable to surface watercourses, the existence and location of such stream must be reasonably ascertainable from the surface of the earth without excavation: *Lybe's Appeal,* 106 Pa. St. 626 (51 Am. Rep. 542); *Haldeman* v. *Bruckhart,* 45 Pa. St. 514 (84 Am. Dec. 511); *Collins* v. *Chartiers.Valley Gas Co.,* 131 Pa. St. 143 (18 Atl. 1012, 17 Am. St. Rep. 791, 6 L. R. A. 280); *Crescent Mining Co.* v. *Silver King Min. Co.,* 17 Utah, 444 (54 Pac. 244, 70 Am. St. Rep. 810); *Barclay* v. *Abra-*

*ham,* 121 Iowa, 619 (96 N. W. 1080, 100 Am. St. Rep. 365); *Black* v. *Ballymona Commrs.,* 17 L. R. Ir. 459.

In the case of *Simmons* v. *Winters, supra,* Mr. Justice LORD, considering what constitutes a watercourse, said:

"When there is a living stream of water, within well-defined banks and channel, no matter how limited may be its flow of water, there is no difficulty in determining its character as a watercourse."

After referring to the definitions of a watercourse given by the courts in numerous adjudications and by eminent text-writers, the learned justice said:

"The conclusion to be deduced from these decisions is, that a watercourse is a stream of water usually flowing in a particular direction, with well-defined banks and channels, but that the water need not flow continuously—the channel may sometimes be dry * * ."

In the case of *Borman* v. *Blackmon, supra,* Mr. Justice BURNETT, discussing the elements of a watercourse, said:

"The water of all streams is derived, directly or indirectly, from surface water which falls, in the beginning, from the clouds; but, whenever in its journey to the sea it flows in one continuous, well-marked channel, it becomes a watercourse, provided this regularly recurs at every returning season."

3. While the underground stream of water that flowed into and from the spring in suit was small, it possessed all those elements, the presence of which the above cases declare, constitute a watercourse. The existence and location of that watercourse was known, or reasonably ascertainable, from the surface without excavation. The flow of the stream was constant throughout the year and of sufficient volume,

especially in the dry season, to indicate that it origi-
nated a considerable distance from the spring. Its
bed and banks were clearly marked by the deep, nar-
row ravine which extended northerly from the spring,
in the bottom of which many wet, boggy places ap-
peared, and by the vegetation growing in the bed and
along the sides of the ravine, also by the effect that
hogs wallowing higher up in the ravine had on the
water flowing into the spring.

The conditions mentioned authorized the conclusion
that a subsurface watercourse existed and flowed in
the bed of the canyon or ravine, and that such water-
course supplied the spring in controversy: *Tampa
Water Works Co.* v. *Cline,* 37 Fla. 586 (20 South.
780, 53 Am. St. Rep. 262, 33 L. R. A. 376); *Hale* v.
*McLea,* 53 Cal. 578.

The facts of the existence and location of an under-
ground watercourse, being established, it follows that
the rules of law pertaining to percolating waters mov-
ing through the soil in no known or definite channel
do not govern the decision in this case.

4. The deed of March 10, 1914, granted to plaintiffs
the right to divert the waters of that underground
stream at the point described in the deed as "a
certain spring near the center of the West line of
said Lot Sixteen (16)," also the right to use those
waters, when diverted, upon the three-acre tract.

The rights so granted are of the same dignity and
are governed by the rules of law applicable to similar
rights upon and to the waters of a surface stream
of like volume and similarly located.

The continued presence of a ditch, such as that ex-
cavated by defendants, parallel with, and below, the
channel of the underground stream from which plain-
tiffs secure their water supply, would completely de-

feat the rights conferred upon plaintiffs by the deed mentioned. The defendants knew that such a ditch would divert from the spring the waters to which they had granted plaintiffs the free and unrestricted use.

In view of that knowledge, the action of the defendants in excavating the ditch mentioned was in direct conflict with the covenants of their conveyance to plaintiffs and an unwarranted invasion of plaintiffs' rights under the deed. That this is so, requires no citation of authorities.

The decree of the Circuit Court is affirmed.
Affirmed.