ROBERT L. JONES, JR., THROUGH HIS GUARDIAN, BLANCHE I. JONES (HOLTZ), AND BLANCHE I. JONES (HOLTZ), INDIVIDUALLY, v. HOME BUILDING & LOAN ASSOCIATION OF THOMASVILLE, NORTH CAROLINA.

(Filed 10 June, 1960.)

**1. Appeal and Error § 7—**

A defendant may file a demurrer *ore tenus* in the Supreme Court on the ground that the complaint, together with any amendment thereto, fails to state facts sufficient to constitute a cause of action.

**2. Waters and Water Courses § 5a—**

Subterranean waters are generally classified as (1) streams or bodies of water flowing in fixed or definite channels, the existence and location of which are known or ascertainable from surface indications or other means without excavations for that purpose, and (2) percolating waters, which ooze, seep or filter through the soil beneath the surface, or which flow in a course that is unknown or undefined, and not discoverable from surface indications without excavations for that purpose.

**3. Waters and Water Courses § 5b—**

The rights and liabilities of adjacent land owners in regard to subterranean streams are governed, so far as practical, by the rules governing surface streams.

**4. Waters and Water Courses § 5a—**

In order for the law of subterranean streams to be applicable in de-

termining the rights and liabilities of adjacent land owners, it is required not only that such streams flow in a well defined channel but also that the owner of the land through which they flow know of their existence or that their existence be discoverable from the surface of the earth without the necessity of any excavation.

**5. Waters and Water Courses § 5b—**

A person who obstructs the flow of a subterranean stream, in like manner as a person who obstructs the flow of a surface stream, is liable in damages for the resulting flooding of lands of a contiguous owner, since ordinarily he knows to a substantial certainty that such action will result in the flooding of the adjacent land.

**6. Waters and Water Courses § 5c—**

A land owner who obstructs or diverts percolating waters ordinarily does not know to a substantial certainty what the consequences will be, and he is not liable for damage resulting to a contiguous land owner so long as his acts do not exceed the bounds of a reasonable exercise of his proprietary rights or a reasonable use of such percolating waters, and therefore do not violate the maxim "*sic utere tuo ut alienum non laedas.*"

**7. Pleadings § 2—**

The function of a complaint is to state in a plain and concise manner the material, essential or ultimate facts which constitute the cause of action; the pleader is not required to plead the law and should not plead the evidence to prove the ultimate facts. G.S. 1-122(2).

**8. Pleadings § 12—**

Upon demurrer, the complaint will be liberally construed with a view to substantial justice between the parties. G.S. 1-151.

**9. Waters and Water Courses § 5a—**

Allegations to the effect that defendant obstructed a subterranean stream, resulting in the flooding of the basement of plaintiff's house on an adjacent lot, *are held* sufficient to state a cause of action for the obstruction of a subterranean stream, it not being required that the complaint set forth the legal definition of a subterranean stream.

**10. Same—**

The complaint in this action, together with its amendment, *is held* to state facts sufficient to constitute a cause of action for the obstruction of percolating water in a negligent manner and the failure to use reasonable care to provide adequate drainage.

**11. Waters and Water Courses § 5b—**

Plaintiffs' evidence in this case *is held* insufficient to establish a predicate for the application of the law of subterranean streams, there being no evidence that there was anything on the surface of the ground to indicate a subterranean stream, except the entrance of a stream into a nearby manhole, and plaintiffs' testimony of a civil engineer to the effect that he knew nothing of the depth or width of the stream or where it originates or terminates, but that he platted the stream as a

conclusion from his observation of water in the manhole together with the contour of the land, etc., being no more than abstruse speculations of an expert.

12. **Waters and Water Courses § 5c— Evidence held sufficient to make out cause of action for negligent obstruction of percolating waters.**
Plaintiffs' evidence to the effect that defendant's lot was lower than plaintiffs' adjacent lot, that defendant in constructing a building on its lot dug footings several feet below the level of plaintiffs' basement and constructed a brick wall on the concrete footings, that immediately upon the construction of the wall water began to seep in plaintiffs' basement, that defendant pumped water from the excavation for his footings and from plaintiffs' basement, that defendant's contractor then constructed a terra cotta tile drain, which stopped the seepage of water into plaintiffs' basement for a short while, but which was insufficient to prevent the almost constant seepage of water into plaintiffs' basement thereafter, *is held* sufficient to show a negligent obstruction of percolating waters by defendant, precluding nonsuit in plaintiffs' action to recover damages to his property from the resulting flooding.

13. **Appeal and Error § 55—**
When a case has been tried under a misapprehension of the pertinent principles of law and of the facts, the verdict and judgment will be vacated and a new trial ordered.

APPEAL by defendant from *Olive, J.*, September 1959 Civil Term, of DAVIDSON.

The jury found by its verdict that defendant wrongfully obstructed a subterranean stream or streams of water flowing through its lands from the lands of plaintiffs, and awarded $7,000.00 as damages.

From judgment on the verdict, defendant appeals.

*Stoner & Wilson and Wilson & Saintsing for plaintiffs, appellees.*
*E. W. Hooper, L. Roy Hughes and Charles W. Mauze for defendant, appellant.*

PARKER, J. Defendant, as it had a right to do (G.S. 1-134; *Howze v. McC'all*, 249 N.C. 250, 106 S.E. 2d 236), filed in the Supreme Court a demurrer *ore tenus* to the complaint, and an amendment thereto allowed by the trial court in its discretion after the close of all the evidence introduced by plaintiffs and defendant, for the reason that the complaint, and the amendment thereto, does not state facts sufficient to constitute a cause of action, in that the complaint, and the amendment thereto, fails to allege that defendant had any knowledge of an underground stream running through its land or that any underground stream could be ascertained from surface indications, and prays that the action be dismissed.

The facts alleged in the complaint are in substance as follows: Plaintiffs own in fee a lot of land fronting 60 feet on Winston Street in the city of Thomasville, and having a depth of 113 feet. Situate on this lot is an eight-room dwelling house, which they rent. Defendant owns a lot of land situate on the north side of plaintiffs' lot, and running 89 feet on Winston Street and parallel with West Guilford Street 120 feet. When defendant purchased this lot of land, it was much lower than plaintiffs' lot, and water from springs located on plaintiffs' lot and the lot purchased by defendant flowed through a channel or channels across the lot purchased by defendant into a storm drain of the city of Thomasville, and that surface water accumulated from the surrounding property and emptied into such drain. Such conditions had existed for 20 years, and were well known to defendant at the time it purchased its lot. In May 1958 defendant made excavations for the construction of a brick building on its lot. For the south wall of its building defendant dug footings several feet below the level of the basement of plaintiffs' house, and then erected a brick wall several feet above the surface of the land, thereby cutting off the flow of the springs and surface water, and causing water to back up in plaintiffs' basement and permanently damage plaintiffs' house, the particulars of which damage are alleged in detail.

In making excavation for the footings and the building of the south wall defendant failed to use due diligence to ascertain the nature and character of the soil to be excavated, the extent of the excavations to be made, and the footings necessary. Defendant failed to use reasonable care to make provisions for carrying off the underground and surface waters. Defendant, by digging the footings several feet below plaintiffs' basement for the south wall of its building, negligently failed to use reasonable care to provide adequate drainage for the surface waters coming on its lot from plaintiffs' lot. That all this caused damage to plaintiffs' house.

Defendant filled in its lot higher than plaintiffs' lot without making adequate provisions to take care of the waters which accumulated through underground streams, springs, and surface waters which has caused damage to plaintiffs' house to the extent that it is becoming unfit for use as residential property.

The amendment to the complaint alleges in substance the following: Defendant well knew before it began in April and May 1958 the construction of a building on its lot adjacent to plaintiffs' house that plaintiffs' land was south of and higher in elevation than its own, and defendant knew, or in the exercise of due diligence should have known, that surface and underground water would flow in its natural

course from the land of plaintiffs onto and across its own land. To construct this building defendant dug adjacent to plaintiffs' land a foundation wall ditch 12 to 15 inches wide, about 9 feet deep, and about 60 feet long into which underground water in large quantities flowed from the south side. Defendant knew, or in the exercise of due diligence should have known, that the building of a foundation wall in this ditch would cause underground water to back upon the premises of plaintiffs on which was located a dwelling house with a basement about 4 to 5 feet below the ground level and higher than the bottom of the foundation wall. Notwithstanding these facts, defendant built a foundation wall in the ditch which obstructed the passage of underground water or a subterranean stream from plaintiffs' land onto and across its own land, causing the water to back up upon plaintiffs' premises resulting in damages to plaintiffs' land and the dwelling house thereon, and constituting an unlawful invasion of plaintiffs' property.

Defendant assigns as error the denial of its motion for judgment of nonsuit renewed at the close of all the evidence. Defendant also assigns as error the denial by the trial court of its prayer for a directed verdict in its favor for the following reasons: One, plaintiffs introduced no evidence tending to show any damage resulting from the obstruction of surface water. Second, plaintiffs' evidence tends only to show the presence of subsurface water on their premises, which it is well settled, will be presumed to be percolating water. Plaintiffs have no evidence tending to show a clearly defined channel containing subterranean water, the location and existence of which are known or ascertainable from surface indications. Therefore, plaintiffs are not entitled to recover anything for damages due to underground waters. Defendant also demurred *ore tenus* in the trial court to the complaint, and further assigns as error the allowance by the trial court of plaintiffs' motion to amend their complaint made at the close of all the evidence.

Plaintiffs' evidence favorable to them tends to show the following facts: Plaintiffs own an eight-room dwelling house with bath and basement, which they rent, situate about eight feet from their north property line, which line is adjacent to defendant's line, on Winston Street in the city of Thomasville. The basement is built of reinforced concrete with a brick foundation and a three-inch thick concrete floor, and has in it two rooms and a bath. The south wall of defendant's building is erected right on its south property line, and runs the entire length of plaintiffs' house.

Defendant's lot, which is north of plaintiffs' lot, extends from plain-.

tiffs' north line to West Guilford Street. From plaintiffs' lot to West Guilford Street there is a decline or slope of about eight feet: the change in elevation from plaintiffs' house to the south wall of defendant's building is about three feet. Defendant's lot had been filled in with dirt by the city of Thomasville, and was damp and wet all the time. West of defendant's property and northwest of plaintiffs' property the land was grown up with willows, and the soil was wet, and water stood there a good deal of the time. The land south of plaintiffs' lot is much higher than their lot. Across defendant's lot was a storm sewer or drain.

The depth of plaintiffs' basement is around four or five feet below the ground level. From 1950 until April or May 1958 it was a dry basement, though two weeks before the trial during a heavy rain water came into the basement for a few minutes through a basement window on the south side level with the ground.

In April or May 1958 defendant began the construction of a building on its lot. At that time Mrs. Blanche Jones Holtz, a plaintiff, told Mr. Phillips, secretary and treasurer of defendant, there was a water situation there, and she wanted him to take care of it. He stated he knew water from the whole section turned onto defendant's lot. In April or May 1958 defendant cut a ditch eight or nine feet deep and about 50 inches wide on its south line to get a footing for the south wall of its building. While this ditch was being cut, water was rising in the ditch all the time, and a pump was installed to pump the water out. After the ditch was cut, concrete was poured in it all Friday afternoon. On Saturday water was coming up on the concrete base and in the ditch. Sunday morning water was in plaintiffs' basement, in some places two inches deep, and plaintiffs' tenant called defendant's secretary and treasurer, Mr. Phillips. Mr. Phillips came, looked at the water in the basement, and said the situation was very bad, and he would try to do something about it. On Monday water was still rising in the basement, and defendant put a pump in the basement and pumped it out. Defendant pumped the water out of the ditch, and the water went down in the basement. Shortly after that defendant's contractor dug a ditch along the south wall of defendant's building, and placed therein terra cotta tiling as a drain and covered it with burlap and stone. The water in the basement then went down again, but in a day or two it was back in the basement. Mr. Phillips looked at the water in the basement on several occasions; but defendant has done nothing about it.

Plaintiffs had F. J. York to install a pump in their basement to pump the water out. He dug a hole in the basement floor to install the pump, and water started coming in. He put in a pump with a capacity of 4,000 gallons per hour, which he ran six or seven hours, so he could install the pump for the plaintiffs. Since the south wall of defendant's building was erected, plaintiffs' basement has had water in it practically every day. Plaintiffs' pump in the basement with a capacity of about six gallons to the minute runs every day about two or three times a day, averaging three or four minutes per run.

Henry Griset, a civil engineer, holding degrees in civil engineering and mechanical engineering from New York University and New York Tech, and now in the contracting business in Salisbury, inspected plaintiffs' premises in July 1958, at which time defendant's building had its walls up, the roof on, and the floor was being installed. He went in plaintiffs' basement, and there was water in the basement coming up through cracks in the floor, seeping in very slowly, and running out of one end of the building. The land outside was sloping to a paved street. There was a catch basin almost in front of plaintiffs' house and another down there, with indications one had been removed. He noticed a surface drain, and went over and looked in it, and there was a 24 to 30-inch line running into the manhole or surface drain. There was also a small drain running in from the south side of this manhole which was flowing, and that flow came from the direction of the back of defendant's building and plaintiffs' house. Griset and a Mr. Myers located a point right here (pointing), which is about halfway of the residence and south of the south wall of defendant's building, a distance of 18 to 24 inches, which was the source of the water running through the manhole. It was an underground subterranean stream, and running into a 12-inch tile running south of defendant's building, and then into a 4-inch drain. The connections were open connecting right at the corner of defendant's building. Griset checked back one manhole, and determined that the flow of the two were almost identical, indicating there was no leak in the storm sewer line. This was the point where the subterranean water was emptied on the land. In Griset's opinion, when the south wall of defendant's building was erected, it stopped up the subterranean stream causing it to pond up, and come through the floor of the basement. Griset made a plat of the premises of plaintiffs and defendant showing the course of the subterranean stream, which is plaintiffs' Exhibit 1, and which the court admitted for the sole purpose of illustrating the testimony of the witness

JONES *v.* LOAN ASSOCIATION.

In respect to this plat Griset, pointing out lines on it, testified: "These lines are contour lines. They indicate levels of the ground. This is the outline of the new building of the defendant and these lines up here are the lines of the terra cotta drain that was put in there against the footing. This dotted red line is the course that the subterranean stream followed before. There is no way of seeing it and you can only do it by getting the contour of the land. That course formerly spread out here and went on out there through the ground and that was changed by the entrance of this solid concrete wall. That diverted the stream into the tile here and around into the catch basins. It is a question as to whether the capacity of that tile drain is sufficient to carry off the stream of water the way it had previously been carried off before. The water backed up in here from that underground point. The stream was flowing heavily now but it has to vary. Sometimes it will flow heavily and sometimes light. This was flowing fairly

heavily for what appeared to be a virtually dry season. Even while there was some water in the basement it was conceivable that more water would come into the basement if the flow increased."

Griset testified in substance on cross-examination: He was on the premises four times during a period of about three weeks. He never saw the premises "in its natural state." The area shown in red (shown on the printed plat as shaded area) on plaintiffs' Exhibit 1 is the subterranean stream. It has two points. This point and the general contour of the land. It had to come from this direction. It followed in general the natural contour of the earth. Where he indicated on the map the subterranean stream is, there is nothing on the surface of the earth to indicate a subterranean stream. He made no excavations to determine the course of the subterranean stream. He said, "I know of my own knowledge where the water came from because a part of the line was exposed. I saw some water in two places that was being conducted through a concrete conduit." He saw no evidence of springs on plaintiffs' lot. When he was there, it was a relatively dry period. He testified: "I don't know of my own knowledge the depth of the water in the subterranean stream. I do not know the width of any stream if it is there. I do not know where the whole stream originates or terminates. I do not know whether or not there are any streams in this area. My opinion and my drawing is based solely upon some water that I observed at this point and at this point and in the manhole taken in connection with the contour of the land and that is the way you determine underground streams." He was then asked this question: "And I believe you formerly said there was no indication visible to me or a person not technically trained in the science as you are as to the location of this stream?" He replied: "I believe the only point that would be visible would be at the entrance of the stream into the manhole." At the edge of defendant's building there is no surface indications whatever of the subterranean stream.

Evidence to this effect was elicited from defendant's witnesses, who have known defendant's lot for periods of time from ten to fifteen to twenty years before the construction of defendant's building thereon: part of the lot was a muddy swamp, and stayed wet like a mud hole at times.

Plaintiffs' evidence clearly shows that the damage by water to their house was caused solely by subterranean water, and not by surface water. Then this question is presented by the evidence: Was the subterranean water a subterranean stream or percolating waters?

Subterranean waters are generally classified as (1) streams or bodies of water flowing in fixed or definite channels, the existence and loca-

tion of which are known or ascertainable from surface indications or other means without excavations for that purpose, and (2) percolating waters, which ooze, seep or filter through the soil beneath the surface, or which flow in a course that is unknown or undefined, and not discoverable from surface indications without excavations for that purpose. *C. & W. Coal Corp. v. Salyer,* 200 Va. 18, 104 S.E. 2d 50; *Clinchfield Coal Corp. v. Compton,* 148 Va. 437, 139 S.E. 308, 55 A.L.R. 1376; *Hayes v. Adams,* 109 Or. 51, 218 P. 933; *Pence v. Carney,* 58 W. Va. 296, 52 S.E. 702, 6 A.L.R. (N.S.) 266, 112 Am. St. Rep. 963; 56 Am. Jur., Waters, Sections 102, 108 and 111; 93 C.J.S., Waters, Sec. 86; Anno. 55 A.L.R. 1386, 109 A.L.R. 397, 29 A.L.R. 2d 1354, Sections 2, 3 and 10. See *Rouse v. Kinston,* 188 N.C. 1, 123 S.E. 482, 35 A.L.R. 1203 — interference with percolating waters.

"It is well settled that unless it appears that underground water in a given case flows in a defined and known channel, it will be presumed to be percolating water, and that the burden of establishing the existence of an underground stream rests upon the party who alleges such fact." 56 Am. Jur., Waters, Sec. 103.

Rights and liabilities in respect to subterranean streams, above defined, and distinguished from percolating waters, are generally governed, so far as practicable, by the rules of law applicable to surface streams. *Tampa Waterworks Co. v. Cline,* 37 Fla. 586, 20 So. 780, 33 L.R.A. 376, 53 Am. St. Rep. 262; *Saddler v. Lee,* 66 Ga. 45, 42 Am. Rep. 62; *Stoner v. Patten,* 132 Ga. 178, 63 S.E. 897; *Wyandot Club v. Sells,* 6 Ohio N.P. 64, 9 Ohio Dec. N.P. 106 (quoted at length in appellant's brief); *Hayes v. Adams, supra;* 56 Am. Jur., Waters, Sec. 109; Gould on Waters, 3rd Ed., Sec. 281; Thompson on Real Property, Per. Ed., Vol. I, Sec. 75, p. 87; Tiffany on Real Property, 3rd Ed. Vol. III, Sec. 748.

"In most of the cases dealing with the subject, questions as to liability for the incidental obstruction or diversion of a subterranean stream in the use of one's own property have been made to depend primarily upon whether the existence and course of the stream are known or ascertainable from surface indications. If so known or ascertainable, liability is determined, ordinarily, by the rules applicable in the case of surface streams; but if unknown or unascertainable, by the rules applicable in the case of percolating waters." 29 A.L.R. 2d 1373-4.

In *Clinchfield Coal Corp. v. Compton, supra,* the Supreme Court of Appeals of Virginia said at p. 447 of their reports: "It is a mistake, however, to suppose that only those waters which ooze or percolate through the soil are subject to the law of percolating waters. They

may flow in a well defined channel and be such as if on the surface would answer the description of a water course, but in order to be subject to the law of surface water, the existence, location and flow of the water must be known to the owner of the land through which it flows, or it must be discoverable from the surface of the earth. Otherwise, no one could with safety make excavations on his own land. Furthermore, 'the knowledge required cannot be reasonably held to be that derived from a discovery in part by excavation exposing the channel, but must be knowledge by reasonable inference, from existing and observed facts in the natural or rather preexisting condition of the surface of the ground. The *onus* of proof lies, of course, on the plaintiff claiming the right, and it lies upon him to show that, without opening the ground by excavation, or having recourse to abstruse speculation of scientific persons, men of ordinary powers and attainments would know, or could with reasonable diligence ascertain, that the stream, when it emerges into light, comes from, and has flowed through, a defined subterranean channel.' "

It has long been settled in North Carolina that a lower owner cannot obstruct a surface stream of water, so as to prevent the water from flowing as it naturally would, and thereby flood the lands and buildings above him, and if he does so, he incurs liability for the damage done by such flooding. *Pugh v. Wheeler*, 19 N.C. 50; *Overton v. Sawyer*, 46 N.C. 308; *R. R. v. Wicker*, 74 N.C. 220; *Porter v. Durham*, 74 N.C. 767; *Cagle v. Parker*, 97 N.C. 271, 2 S.E. 76; *Ridley v. R. R.*, 118 N.C. 996, 24 S.E. 730; *Mullen v. Canal Co.*, 130 N.C. 496, 41 S.E. 1027; *Chaffin v. Mfg. Co.*, 135 N.C. 95, 47 S.E. 226; *Clark v. Guano Co.*, 144 N.C. 64, 56 S.E. 858; *Winchester v. Byers*, 196 N.C. 383, 145 S.E. 774; *Braswell v. Highway Comm.*, 250 N.C. 508, 108 S.E. 2d 912. To the same effect see 56 Am. Jur., Waters, Sec. 18; 93 C.J.S., Waters, Sec. 17; Tiffany on Real Property, 3rd Ed., Vol. III, Sec. 731.

A person who obstructs the flow of a known subterranean stream, ordinarily knows to a substantial certainty that he will prevent the water from flowing as it naturally would, and his obstruction is therefore intentional. On the other hand, a person who obstructs the flow of mere percolating waters ordinarily does not know to a substantial certainty what the consequences will be, and the harm which does result is not intentional. Restatement of the Law of Torts, Vol. IV, p. 333.

The most accurate statement that we have found, after an exhaustive search, as to the conflict of opinion in the cases as to the obstruction of percolating waters is found in Annotation 29 A.L.R. 2d 1358, which is as follows: "In the cases dealing with liability for the

obstruction or diversion of percolating waters in the use of one's own premises, such liability, or immunity therefrom, has usually been based, in the absence of contract or statute, on one or both of the fundamental principles governing rights and liabilities as between adjoining or neighboring landowners generally. One of these principles or doctrines is that the owner of the soil owns everything above or below the surface, upward to the sky and downward to the center of the earth, expressed in the maxim *'cujus est solum, ejus est usque ad coelum et ad inferos.'* The other is that one must so use his own as not to injure another, expressed in the maxim *'sic utere tuo ut alienum non laedas.'* Some courts have applied or emphasized one of these principles to the exclusion or minimization of the other, while others have sought to give effect to both in harmony. In England, where the question first arose, the view was taken that the ownership and control of land, under the maxim *'cujus est solum,'* etc., applied to and included the percolating water therein, and, consequently, that any obstruction or diversion thereof by the owner or occupant of land, incident to the use thereof, to the injury of an adjoining or neighboring owner or occupant, was, at least in the absence of negligence or malice, *damnum absque injuria.* This rule, which has been referred to as the 'common-law' or 'English' rule, was followed in many of the early cases in this country, and apparently still prevails in a slight majority of the jurisdictions in which the question has been adjudicated." A multitude of cases are cited in support of the text. To the same general effect, see 56 Am. Jur., Waters, Sec. 120, interference with percolating waters; 93 C.J.S., Waters, pp. 774-5.

In *Rouse v. Kinston, supra,* the city of Kinston diverted percolating waters from plaintiff's land drying up his artesian wells for the purpose of supplying its inhabitants with water. In that case this Court took the view that the so-called common law or English rule involved an unnecessary denial or restriction of the principle expressed in the maxim *"sic utere tuo ut alienum non laedas,"* and imposed thereon the limitation or qualification that, in order to confer immunity from liability for the diversion, the causative activity or conduct must be a reasonable exercise of a proprietary right. In that case this Court said on page 23 of our reports: "We think the American rule, adopted in most of the States where this question has arisen, the 'reasonable use' of percolating water, the correct rule." As to American Rule—Doctrines of Reasonable Use and Correlative Rights—see 56 Am. Jur., Waters, Sec. 114; 93 C. J. S., Waters, Sec. 93 c(3) ; Anno. 55 A.L.R., p. 1398; 109 A.L.R. p. 399; 29 A.L.R. 2d pp. 1361-1373. The same rule is applicable to the obstruction of

percolating water as to its diversion. Anno. 29 A.L.R. 2d pp. 1361-1373.

Plaintiffs allege, *inter alia*, in their complaint, and the amendment thereto, facts showing an obstruction by defendant of a subterranean stream flowing through their lot, causing such stream to back up on their premises resulting in damage to their house. Defendant contends that the demurrer *ore tenus* filed in this Court should be sustained, for the reason that their complaint, and the amendment thereto, "fails to allege that defendant had any knowledge of an underground stream running through its land or that any underground stream could be ascertained from surface indications."

The function of a complaint is to state in a plain and concise manner the material, essential or ultimate facts which constitute the cause of action, but not the evidence to prove them. G.S. 1-122 (2); *Parker v. White*, 237 N.C. 607, 75 S.E. 2d 615. It is not necessary to plead the law. The law arises upon the facts alleged, and the court is presumed to know the law. McIntosh, N. C. Practice & Procedure, 2d Ed., p. 528. Plaintiffs are not required to allege in their complaint, and the amendment thereto, the legal definition of a subterranean stream. Construing the complaint, and the amendment thereto, liberally with a view to substantial justice between the parties, as we are required to do by G.S. 1-151, it is our opinion, that though inartistically drafted and confused, the complaint, and the amendment thereto, suffices in stating facts sufficient to constitute a cause of action for the obstruction of a subterranean stream, and also for the obstruction of percolating water in negligently failing to use reasonable care to provide adequate drainage for percolating water under the doctrines of reasonable use and correlative rights, which we adopted in *Rouse v. Kinston, supra*. The demurrer *ore tenus* filed in this Court and a similar demurrer *ore tenus* filed in the trial court were properly overruled.

Defendant assigns as error the denial of its motion for judgment of nonsuit, renewed at the close of all the evidence. Plaintiffs have no evidence showing damage by surface water: their evidence shows damage by subterranean water. The case was tried on the theory as to whether or not defendant wrongfully obstructed a subterranean stream or streams, and on the motion for judgment of nonsuit it is briefed on that theory.

In considering plaintiffs' evidence and so much of defendant's evidence, if any, favorable to them (*Polansky v. Insurance Ass'n.*, 238 N.C. 427, 78 S.E. 2d 213) as to a subterranean stream, it is well settled law that all underground waters are presumed to be percolating, and to overcome this presumption the burden of proof rests upon the

plaintiffs, who contend that defendant wrongfully obstructed a subterranean stream or streams, to show the existence of a stream or body of water flowing in fixed or definite channels, the location of which is known or ascertainable by men of ordinary powers and attainments from surface indications or other means without excavations for that purpose or without having recourse to "abstruse speculations of scientific persons." 56 Am. Jur., Waters, Sec. 103; 93 C.J.S., Waters, Sec. 87; Thompson on Real Property, Per. Ed., Vol. I, p. 85; Tiffany on Real Property, 3rd Ed., Vol. III, p. 180; Gould on Waters, 3rd Ed., p. 557; *Clinchfield Coal Corp. v. Compton, supra.*

Plaintiffs' evidence shows there was nothing on the surface of the ground to indicate a subterranean stream, except at the entrance of a stream in a manhole. Plaintiffs' evidence as to a subterranean stream is based upon "the abstruse speculations" of their witness Henry Griset, a civil and mechanical engineer, who testified he knew nothing of the depth or width of the stream, or where it originates or terminates, and who solely bases his opinion and the drawing of the subterranean stream on his plat, Plaintiffs' Exhibit 1, "upon some water that I observed at this point and at this point and in the manhole taken in connection with the contour of the land." From the evidence offered by plaintiffs men of ordinary powers and attainments could not know or could not with reasonable diligence ascertain that the water was a subterranean stream flowing in fixed or definite channels without opening the ground for excavations or having recourse to "abstruse speculations of scientific persons." Plaintiffs have no proof that the subterranean waters were other than percolating waters. However, plaintiffs' evidence, considering it in the light most favorable to them and giving to them every legitimate inference to be drawn therefrom, does tend to show a negligent obstruction of percolating waters, and that suffices to overcome defendant's motion for judgment of nonsuit, and the case should have been submitted to the jury on that theory.

When a case has been tried under a misapprehension of the pertinent principles of law and of the facts, the verdict and judgment will be vacated and a new trial ordered. *Caddell v. Caddell,* 236 N.C. 686, 73 S.E. 2d 923; *Credit Corp. v. Saunders,* 235 N.C. 369, 70 S.E. 2d 176; *Coley v. Dalrymple,* 225 N.C. 67, 33 S.E. 2d 477. Therefore, the verdict and judgment will be vacated, and a new trial is ordered.

New trial.